JOHN DELANEY, PLAINTIFF IN ERROR, v. CHARLES ERRICKSON, DEFENDANT IN ERROR.

1. **Trespass by Stock on Uninclosed Uncultivated Lands.** Action in the nature of trespass for damage committed by the cattle and sheep of defendant, by pasturing on the uninclosed uncultivated wild prairie land, of which plaintiff was lessee of the owner. *Held*, That such action could not be maintained.

2. **Evidence: RECORD OF DEED.** One link in plaintiff's chain of title was a deed from one Shorter to Young, plaintiff's lessor, which deed contained thirty-three descriptions of land in three different counties, while the lease from Young to plaintiff contained but one of said descriptions. *Held*, That the record of said deed was properly received in evidence on the trial, without inquiry as to the possession of the original.

3. **Letterpress Copies of Private Papers.** On the trial the plaintiff was permitted to read to the jury a letterpress copy of a letter written by D., agent of the lessor of the plaintiff, to his principal, concerning the leasing of the said lands to the plaintiff without proof of the loss or non-possession by the plaintiff of the original. *Held*, To be error.

ERROR to the district court for Dodge county. The action there was brought by Errickson, who claimed damages for trespass on a quarter section of land of which he was the lessee, and on which he alleges Delaney grazed his cattle and sheep for two or three months during the summer of 1879. Errickson's title to the land was put in issue by the answer, and there was a further defense by Delaney "that the said land is, and always has been, uncultivated, uninclosed, wild prairie land, and is, and ever since the first settlement in Dodge county has been, common grazing land for the cattle and sheep of the inhabitants; and from the earliest settlement in Dodge county it has been the common custom of the inhabitants of said county and of the defendant to graze their cattle and sheep upon said land, and by the customs and laws of this state

the said land is common and free grazing land to all inhabitants; and that the defendant is, and for ten years last past has been, a resident of said county, living on his own land, adjoining to that said land, and engaged in the business of agriculture and stock growing and breeding." Errickson had judgment before Post, J., and Delaney came here upon a petition in error.

*E. F. Gray* and *W. H. Munger*, for plaintiff in error, cited *Kerwhacker v. C. C. & C. R. R. Co.*, 3 Ohio State, 172. *The C. H. & D. R. R. Co. v. Waterson & Kirk*, 4 id., 424. *C. C. & C. R. R. Co. v. Elliott*, 4 id., 474. *Seely v. Peters*, 5 Gil. (Ill.), 130. *Wagner v. Bissell*, 3 Iowa, 396. *Walers v. Moss*, 12 Cal., 535. Sherman & Redfield on Neg. Sec., 316 and 319.

*G. L. Loomis* and *N. H. Bell*, for defendant in error, cited *Powers v. Kindt*, 13 Kan., 74. *Hefley v. Baker*, 19 id., 1. *Powers v. Clarkson*, 17 id., 218. *Larkin v. Taylor*, 5 id., 446.

Cobb, J.

It cannot be denied that at common law every one was obliged at his peril to keep his domestic animals off of the lands of another, and it made no difference whether such lands were inclosed or uninclosed, cultivated or uncultivated.

The first legislature convened in the territory of Nebraska passed an act which (in substance) now constitutes chapter ten of the general laws, and is in the following words: "So much of the common law of England as is applicable and not inconsistent with the constitution of the United States, with the organic law of this territory, or with any law passed or to be passed by the legislature of this territory, be and the same is adopted and declared to be law within said territory."

It will be necessary then to examine, first, whether that provision of the common law of England, above referred to, is applicable to the people of Nebraska in their condition at the time of the passage of said act and down to the present time; and, secondly, whether such provision and principle of the common law are consistent with the several acts of the legislature of the state and late territory bearing upon the question involved in this inquiry.

For a number of years following the establishing of the territorial government, the settlements were almost exclusively confined to the near vicinity of the Missouri river and the small streams emptying into it, where timber for fencing was comparatively plentiful, sufficiently so to enable the settlers to fence such land as they desired to cultivate, and by so doing they were enabled to allow their numerous herds of cattle the free range of the almost boundless prairie at their doors. But soon the lands were commenced to be surveyed and brought into market, and, as the homestead law was not yet enacted, nor the wise policy of reserving the public lands for the use of actual settlers yet adopted, a large number of tracts of land soon became the private property of individuals, many of whom had never been, nor ever expected to be, inhabitants of the territory.   Such purchasers of land took an absolute allodial estate in them.   Nevertheless they took such estate subject to any and all the conditions which nature, the policy of the government, the undeveloped state of the country, and the state of society had thrown around it.   Among these was the fact that it was the settled policy of the general government, which owned the surrounding lands, to throw them open to free and unrestricted pasturage.   This was to the early settler and emigrant a valuable privilege, but one which they could not enjoy if each owner of stock was compelled

to stand watch over his cattle to keep them off of each tract of land which, by reason of entry at the distant land office, should become the private property of individuals. The cattle could not be taught to regard the mounds of the government surveyors, nor that invisible line which, according to Blackstone, the common law of England draws around the possessions of every landholder.

But as emigration continued and population increased, the settlements extended out upon the open prairies where timber for fencing was not to be had, and we then having no railroad communication with the pineries or the Mississippi river, had each settler been obliged to provide a fenced pasture for his stock to keep them off of the lands of others, the settlement of the territory would have been impracticable. But it being equally impossible to procure fencing to enclose the cultivated fields, there arose a necessity for a law to compel the owners of stock to employ herders for its control, to keep it off of the growing crops. The proposition to enact such a law was regarded with disfavor by the inhabitants of the timbered portion of the state, and for a time strenuously opposed. Hence the peculiar character of the earlier herd laws, and even now five of the northern counties are specifically exempted from its provisions, and a method is prescribed by which any county may at any time take itself out of such operation by a majority vote of the inhabitants. But during the entire history of the territory, as well as that of the state, down to a recent period, it had never been even suggested that neat cattle were, by virtue of any law or custom, required to be either fenced or herded off of wild, uncultivated lands. But the universal understanding, belief, and usage of the people has been to the contrary.

It is claimed, and possibly with justice, that the time

has now arrived, when, by reason of the great increase in the density of the population of the state, and the enhanced value of grazing land, the owners of such lands should be protected in its exclusive enjoyment, the same as land sown to crops. If the time has arrived for such change, the legislature and not the courts is the place where it should be inaugurated.

It therefore appears to me that the common law of England, in the respect under consideration, was not "applicable" to our state and condition at the time of the framing of our laws and institutions, even if it can be said to be so now.

Upon examining the several acts passed by the legislature—state, as well as territorial—and applying the provisions of the English common law above referred to to them, it will be found to be utterly inconsistent with both their letter and spirit. The first legislature of the territory passed two acts, which were severally approved March 2, 1855, whereby stallions, mares, and asses over the age of two years were restrained from running at large, under a penalty to their owners of five dollars for the first offense, and ten dollars for each succeeding offense, and every person finding such animals running at large was authorized to take them up as estrays. Also restraining sheep and swine from running at large, and making the owners responsible in damages for all damage to property committed by any such animals running at large contrary to the provisions of said act.

These acts seem to have stood until 1857, when on the thirteenth of February there was approved an act entitled, "An act concerning enclosures, trespassing animals, and partition fences." By section two it was provided that if any domestic animal break into an enclosure, the person injured thereby shall recover the amount of damage done, if it shall appear that the

fence through which said animal broke was lawful, but not otherwise.  By section four it was provided that when any domestic animal shall break into the enclosure of any person, such person, without regard to the season of the year, may take up such animal as if an estray, etc.

The above act was repealed by an act approved January 13, 1860, entitled, "An act to regulate enclosures and partition fences."  The first seventeen sections provide what shall constitute lawful fences, etc.  Section 18 provides that if any domestic animal break into any enclosure the person injured thereby shall recover the amount of damage done, if it shall appear that the fence through which said animal broke was a lawful fence.  Section 20 provided that if any person sow any grain or plant any crop without enclosing the same with a sufficient fence as above provided, he shall be liable for all damages that any person or persons may sustain in consequence of such neglect to enclose the same, etc.

January 11, 1861, there was approved an act entitled, "An act to provide for an estray law."  By section one of this act it is provided, "That any freeholder may take up any stray horse, mule, ass, neat cattle, sheep, or swine, found within his enclosed premises, at any season of the year; any stray found around the premises of any freeholder between the first day of November and the first day of April, may be taken up by such freeholder," etc.  This law was re-enacted, with slight modification, to make it apply to persons holding land by lease and title bond as well as deed, by an act approved February 13, 1865, and remains in force.  Gen. Stat., 368.

June 15, 1869, there was approved an act entitled " An act to protect cultivated lands from trespass by stock."

34

Section one provides: " That the owners of cattle, horses, sheep, and swine in this state shall hereafter be liable for all damage done by such stock on culti-vated lands in this state, as provided in this act."

Section two gives the owner or person in actual possession of any cultivated lands in this state who complies with the provisions of said act a lien on all and any stock that shall trespass on such lands.

Section three gives double damages, etc.

Section six provides: " That no person shall be liable for any damages done by stock unless the party in possession of the land on which such trespass is committed shall, the first year the protection of this law is claimed, plow a hedge-row not less than ten feet wide on all sides of the land so protected by this law, and shall every year thereafter set out on some land so protected by this law not less than four rods of live fence, and not less than ten trees for each acre of land so protected."   The last act was repealed by an act approved March 4, 1870, entitled " An act to restrain stock from running at large in the state of Nebraska."

Section one provides: " That it shall be unlawful for cattle, horses, mules, sheep, swine, or other stock to run at large at any season of the year in the state of Nebraska."   Section two provides: " That when any such stock shall be found on the premises of an-other it shall be lawful for the owner or person in possession of said premises to impound said stock," etc.   Section five provides that " No assessment or collection of damages shall be had or made for any trespass by any such stock upon any land unless the same shall have a strip ploughed around of not less than one rod wide."   This act only remained in force for one year, when it was superseded and repealed by the general herd law now in force.   Gen. Stat., 83.

In the above history of the legislation of the state and late territory of Nebraska on this subject I have deemed it advisable, for the sake of some degree of brevity, not to notice the numerous local herd laws which have been from time to time enacted to apply to one or more counties or precincts and again repealed, but of them it will be sufficient to say that they are all similar in their provisions to the general herd-law herein referred to, in so far as it was only designed to protect cultivated land.

It will thus be seen that if that principle of the common law of England, which draws a sacred line around every man's land and makes every one a trespasser who passes it without permission, has, since March 16, 1855—the date of the passage of the act first hereinbefore referred to—applied to the unmarked and unbroken sod of our prairies, certainly our lawmakers have not known it. Why, it may well be asked, make it unlawful for stallions, mares, and asses over the age of two years to run at large if it were already unlawful for any animals of any age or sex to do so? And why enact laws making the owners of animals breaking through a lawful fence and committing damage liable therefor if they were already by the common law liable for all such damages without regard to any inclosure, lawful or unlawful? Indeed, these acts, other than the two acts first above mentioned and the herd-laws, by the use of negative words equally expressive as a positive provision, excuse all trespasses by stock except upon lands inclosed by a lawful fence. Again, in regard to the herd law, would the legislature have provided specially for holding the owners of stock liable for damages committed on cultivated land except upon the theory that they were not, by virtue of any law, already liable for all damages committed by such stock on

any property of others, whether cultivated or uncultivated?

From these considerations I come to the conclusion that the principle of the common law of England, which "has treated every entry upon another's land," even by cattle, "unless by the owner's leave, as an injury or wrong, for satisfaction of which an action of trespass will lie," is not "applicable" to the uncultivated, uninclosed wild prairie lands of this state.

It necessarily follows therefore, that the district court erred in giving the instructions prayed by the plaintiff below, and in refusing to give the instruction numbered one prayed by defendant.

The plaintiff in error makes another point: that "the court erred in admitting in evidence on behalf of the plaintiff the record in the county clerk's office of said county of a deed from one Shorter to said Young of said land mentioned in said petition, the original not having been accounted for." This point I think is not well taken. Sec. 13, chap. 61 Gen. Stat., p. 874, provides that: "The record of a deed duly recorded, or a transcript thereof duly certified, may also be read in evidence with the like force and effect as the original deed whenever by the party's oath or otherwise the original is known to be lost or not belonging to the party wishing to use the same, nor within his control." Shorter is Young's grantor of the lands in question. Young is the lessor of the plaintiff. The deed from Shorter to Young contained thirty-three descriptions of land, situated in Douglas, Sarpy, and Dodge counties, while the lease from Young to the defendant in error was only for one quarter section of land, being one of said descriptions. In such a case there is no presumption that Errickson ever had possession of the deed in question, but the presumption is very strong the other way, sufficiently in

my opinion to justify the admission of the record in evidence, without inquiry as to the possession of the original deed.

The only remaining point which I deem it necessary to examine is that arising upon the objection, on the part of the plaintiff in error, to the admission in evidence of a letterpress copy of a letter written by G. W. E. Dorsey to E. B. Young, without first accounting for the original. I know of no law or authority taking letterpress copies of private papers, out of the general rule, which prohibits that character of secondary evidence, except in certain cases of necessity, arising upon the loss or accidental destruction of the originals. But on the contrary, in the only adjudicated case which I am able to find bearing directly on the point—*Foot v. Bentley*, 44 N. Y., 170—the commission, by Gray, C., say: "We are of opinion that they (letterpress copies of letters) were not in any sense original papers, and were in their character copies to the same extent that other copies carefully compared would have been, neither of which could be read in evidence without first giving notice to produce the originals." And this I think to be the law.

It therefore follows that the judgment of the district court must be reversed, and the cause remanded for further proceedings according to law.

REVERSED AND REMANDED.