No. 24,138.

RODNEY DOUGHTY, a Minor, by Edyth M. Woods, his Next Friend,
*Appellant*, v. RAY ENGLER, *Appellee.*

SYLLABUS BY THE COURT.

ILLEGITIMATE CHILD—*Father Under Obligation to Support It.* The father of
an illegitimate child too young to care for itself is under a nonstatutory
obligation to support it, which may be enforced in an action brought by
it through its next friend.

Appeal from Clay district court; FRED R. SMITH, judge. Opinion filed
January 6, 1923. Reversed.

*R. C. Miller,* and *C. Vincent Jones,* both of Clay Center, for the appellant.
*William M. Beall,* and *W. T. Roche,* both of Clay Center, for the appellee.

The opinion of the court was delivered by

MASON, J.: A four-year-old boy, born out of wedlock, brought
this action through his mother as his next friend, against one
alleged to be his father, to require the defendant to make provision
for his support. This appeal is taken from the sustaining of a de-
murrer to the petition.

At common law the father of an illegitimate child was under no
legal duty to support it. In behalf of the plaintiff it is urged that
this rule is not sound in reason and not in keeping with modern
ideas of natural right, and should not be regarded as remaining in
force in aid of our statutes by virtue of the act giving that effect
to the common law as modified by "the conditions and wants of the
people." (Gen. Stat. 1915, § 11829.) The courts of this country ap-
parently in every case in which the question has been raised have
held, that without legislation on the subject, the father of an illegiti-
mate child cannot be required to provide for its support. (7 C. J.
955.) In most of these cases, however, the matter has been treated
as settled by the mere fact that the common law recognized no such
duty on his part, and the question whether the rule is so repugnant
to present-day conceptions of social obligations that courts should
refuse to follow it has not been extensively discussed.

The common law with almost uniform consistency treated an
offspring of parents not married to each other as *nullius filius*—the
son of no one—of no father and no mother. That is to say, it closed

its eyes to the fact of that relation and in legal aspect ignored its existence. It absolved the mother equally with the father from liability for the support of the child (*Ruttinger v. Temple,* 4 B. & S. 491), although this has been doubted (*Humphrys v. Polak,* 1901, 2 K. B. D. 385, 389). It also denied to both parents the legal right to its custody. The question asked in an earlier case, "How does the mother of an illegitimate child differ from a stranger? has been interpreted as "stating bluntly this legal doctrine." (*Barnado v. McHugh,* Appeal Cases, [1891] 388, 398.) In equity, however, recognition was made of "a sort of blood relationship" (*The Queen v. Nash,* 10 Q. B. D. 454) that entitled the parents to some consideration in the matter. But the common law in failing to require the parent of an illegitimate child to support it did not rest wholly upon the *nullius filius* idea, for as interpreted in England and in some of the American states it imposed no legal obligation in that respect even upon the parents of legitimate children. (20 R. C. L. 622; Tiffany's Persons and Domestic Relations, 2d. ed., § 116.) By the great weight of judicial opinion in this country parents are under a legal duty, regardless of any statute, to maintain their legitimate minor children (20 R. C. L. 622), the obligation being sometimes spoken of as one under the common law and sometimes as a matter of natural right and justice, and often accepted as a matter of course without the assignment of any reason. Chancellor Kent says: "The wants and weaknesses of children render it necessary that some person maintain them, and the voice of nature has pointed out the parent as the most fit and proper person. The laws and customs of all nations have enforced this plain precept of universal law." (2 Kent's Commentaries *189.) Blackstone begins his discussion of the duties of parents to legitimate children thus:

"The duty of parents to provide for the *maintenance* of their children, is a principle of natural law; an obligation, says Puffendorf, laid on them not only by nature herself, but by their own proper act, in bringing them into the world; for they would be in the highest manner injurious to their issue, if they only gave their children life that they might afterwards see them perish. By begetting them therefore, they have entered into a voluntary obligation, to endeavor, as far as in them lies, that the life which they have bestowed shall be supported and preserved. And thus the children will have a perfect *right* of receiving maintenance from their parents." (1 Blackstone's Commentaries, 447.)

The full language of Puffendorf, from which Blackstone made the foregoing condensation, is as follows:

"As to that Maintenance, which Parents owe their Children, it hath been doubted by Authors, whether the Obligation to pay it were perfect or imperfect, or whether it belong'd to expletive or to attributive Justice. 'Tis the Opinion of some, *That Parents do indeed owe their Children Maintenance, but then 'tis by the latter kind of Justice only, and not by the former; so that Parents would act very inhumanly, should they deny them this Assistance; yet Children have no Right to challenge it from them against their Wills, this being the proper effect of expletive Justice: though civil Statutes may invest Children with a full and perfect Right in this Matter.* But we are rather inclined to think, That *Parents* lie under a *Perfect Obligation* to maintain their *Children,* so long as they are unable to maintain themselves; and this Duty seems to be laid upon them, not only by Nature itself, but by their own proper Act, in bringing them into the World. For they would be in the highest manner injurious to their Issue, should they have given the Children Life, for no other Reason, but that they might afterwards see them perish. By the *Act of Generation* therefore they seem to have voluntarily bound themselves, to endeavour as far as in them lies, that the Life which they have bestowed shall be supported and preserved. And thus the Children will have a *perfect Right* of receiving Maintenance from their Parents. Yet this right is hinder'd from producing all its effects by the natural Weakness of Children under that Age, in which they cannot provide for their own Support. And consequently they do not so much want Right as Power and Strength to execute that Right; only in some Points the civil Ordinances help them out, and compel their *Parents* to keep and feed them, upon refusal." (Puffendorf's Law of Nature and Nations, Book IV, Chapter XI, § 4.)

To this Puffendorf added these words:

"Farther, Maintenance is due not to legitimate Children alone; but to natural, and even to incestuous Issue. For what Reason is there that the poor innocent Infant should be suffer'd to famish for another's Sin?" (§ 6.)

A sufficient reason for holding parents to be under a legal obligation, apart from any statute, to support their legitimate child while it is too young to care for itself, is that the liability ought to attach as a part of their responsibility for having brought it into being. If that reason is not found convincing, it would be useless to seek others. And it does not in the least depend for its force upon the fact that the parents were married to each other, but is equally persuasive where that is not the case. It was true when Puffendorf elaborated it and applied it to illegitimate children in 1672, and it is true now.

The courts of some states, in the absence of a statute on the subject, hold the mother of an illegitimate child liable for its support,

usually upon the ground that such liability is an incident to her right of custody (7 C. J. 956), which is sometimes assumed to exist at common law—a sort of inversion of the process by which a statutory duty of support has been said to carry with it the right of custody. (*Humphrys v. Polak*, 1901, 2 K. B. D. 385, 389.) This court does not regard the duty of support as dependent upon the right to custody. (*Riggs v. Riggs*, 91 Kan. 593, 603, 138 Pac. 628.)

In a commissioner's opinion in a statutory action to charge the father of an illegitimate child with its support it was said: "Under the law, the mother of an illegitimate child is all the while known, and is at all times, at least during its infancy, liable for its support, while the father of such child is unknown until ascertained by judicial proceedings, unless he acknowledges its paternity; and therefore, he is liable only when the paternity of the child is acknowledged by him, or it is established by judicial inquiry." (*The State, ex rel., v. Reed.* 46 Kan. 500, 502, 26 Pac. 955.) This was sufficiently accuate for the purposes of the case, the paternity of the child being the matter to be determined. No attempt was there made to state the ground of the mother's liability. As already indicated we place it upon the fact of parentage, and upon that basis it must extend to the father as well. The circumstance of the father's being unknown could not relieve him from the nonstatutory inherent obligation if it exists at all, although the difficulty of ascertaining the paternity might as a matter of policy influence legislation on the subject.

We do not think the legislature should be regarded as intending to relieve the father from this obligation to the child by the enactment of the statute above referred to, which authorizes the mother of an illegitimate child, if she sees fit, to maintain an action for her benefit in the name of the state against the putative father, and provides for the enforcement of a judgment by imprisonment. (Gen. Stat. 1915, ch. 50.) It would obviously be inadequate to cover the entire field of paternal liability, since the mother might not care to institute such a proceeding, or might die without instituting it. The measure is one providing machinery for the enforcement of a duty already existing rather than one creating a new obligation. Parental liability for the support of legitimate children did not originate with the statute of 1911 (Gen. Stat. 1915, §§ 3410-16) imposing punishment for a default in that respect. Wagering contracts valid at common law are held nonenforceable even where they do not fall within the prohibition of statutes condemning gambling.

(*Cleveland v. Wolff,* 7 Kan. 184, 12 R. C. L. 747, 748.) A rule of the common law may be unadapted to the conditions and unsuitable to the needs of the people of this state, although the change that has taken place is rather in the manner of looking at things—in the standards of obligation and conduct—rather than in more objective matters. Instances in which this court has refused to follow a rule of the common law, for reasons based in a greater or less degree upon its essential unsoundness, are collected in *Cooper v. Seaverns,* 81 Kan. 267, 105 Pac. 509, where the grounds of such departure are fully discussed.

The right of a child of tender years to look to its father for support being determined, the matter of procedure presents no great difficulty. See *Craig v. Shea,* 102 Neb. 575, and *Sanders v. Sanders,* 167 N. C. 317. A court of equity in its historical capacity as guardian of infants can readily devise means for its enforcement.

The judgment is reversed and the cause is remanded with directions to overrule the demurrer to the petition.