680

DORIS FAY CARLSON ET AL., APPELLEES, V. RUSSELL W. BAR-
TELS, ADMINISTRATOR, APPELLANT: G. OLDENBURG,
INTERVENER, APPELLANT.

10 N. W. (2d) 671

FILED JULY 30, 1943. No. 31517.

*Harry N. Larson* and *A. C. R. Swenson,* for appellants.

*Fred S. Berry, contra.*

Heard before SIMMONS, C. J., PAINE, CARTER, MESSMORE,
YEAGER and CHAPPELL, JJ.

SIMMONS, C. J.

This is an action in equity, brought in the district court
for Wayne county, wherein Helen Kahler as next friend of
her two minor children sought for them a judgment that
they are the children of Nels Carlson, deceased, that his
estate is liable for the care, support and maintenance of
said children; that the amount be determined and charged
against his estate as a lien; that a trustee be appointed to

hold, manage and disburse funds allowed, and for equitable relief. The Consul of Sweden intervened in opposition to plaintiffs' petition to assert the rights of brothers and sisters of the deceased (nationals of Sweden). The defendant administrator and Consul demurred on the ground that a cause of action was not stated, and the Consul on the added ground that the district court was without jurisdiction of the subject-matter of the action. The demurrers were overruled. The administrator and Consul answered separately, denying that the deceased was the father of the children, and the Consul alleging in his answer the same grounds as stated in his demurrer. Trial was had, a finding for the plaintiffs made and decree entered holding that the plaintiffs are the children of the deceased, that his estate was liable for their support, maintenance and education, and the sum of $3,250 was fixed as the amount to be paid into court, to be held subject to the court's order for that purpose. After motions for new trial were overruled, defendants appeal. We reverse the judgment of the trial court.

Three questions are presented: The jurisdiction of the district court over the subject-matter of the action; the holding that paternity was proved; and the right to recover against the estate of the deceased father.

The following facts are admitted by the pleadings: Plaintiff Doris Fay Carlson was born October 4, 1933, and Alma May Carlson was born December 18, 1938, both at a hospital in the city of Wayne, in Wayne county, and both the children of Helen Kahler; Helen Kahler was at all times involved herein the wife of one Ed Kahler; Nels Carlson was an unmarried man, a farmer, residing near Wayne, who died intestate October 9, 1940; his estate is being probated in Wayne county, and defendant is the administrator.

Established by the evidence of friends, neighbors, relatives, peace officers and others are the following facts. Helen Kahler and Ed Kahler had two children, not involved in this action. Mr. and Mrs. Kahler separated in 1931 following court action to compel him to support his wife and

children, and thereafter Ed Kahler disappeared and has not since been seen by any one in or about his old haunts where his wife continued to live during all the time involved in this action. In May, 1932, Mrs. Kahler, with the two Kahler children, went to the near-by home of the deceased as his housekeeper, and remained there until Carlson's death. On each occasion, when the two children (plaintiffs) were born, Carlson took Mrs. Kahler to the hospital, paid the medical and hospital expenses, told the doctor he was the father in each instance, had the older child baptized by his minister, told friends and relatives that the plaintiffs were his children, and cared for them in his home as his own. Two policies of insurance were taken out in which Carlson and Mrs. Kahler were designated "husband" and "wife." Carlson and Mrs. Kahler went with the children to visit friends, to town for marketing and generally lived at home and in the community as though they were husband and wife, although there were those who knew they were not. Plaintiffs have no estate, income or means of support.

It was established on cross-examination of the administrator that contingent claims on behalf of Alma May Carlson and Doris Fay Carlson were filed in the estate matter in county court.

Defendant offered the testimony of Carlson's sister and her husband to the effect that in 1940 the deceased denied the paternity of the children.

We come first to the question of the jurisdiction of the court over the subject-matter of the action. The question was first raised by demurrer and again by answer. Intervener Consul argues that, under the provisions of section 16, art. V of the Constitution of the state of Nebraska, and section 27-503, Comp. St. 1929, this action is one where the original jurisdiction is in the county court.

"Jurisdiction of the subject-matter, in a court of record, is to be tested by the authorized extent of the powers of the court in respect of the cause of action before it." *Brandeen v. Lau*, 113 Neb. 34, 201 N. W. 665. "Jurisdiction of the subject-matter is the power to hear and determine cas-

es of the general class to which the proceedings in question belong." 21 C. J. S. 36, sec. 23, 15 C. J. 734. See 14 Am. Jur. 368, sec. 168. See, also, 21 C J. 34; 30 C. J. S. 327, sec. 9; 1 Pomeroy, Equity Jurisprudence (4th ed.) 153. "The test for determining jurisdiction is ordinarily the nature of the case, as made by the complaint, and the relief sought." 15 C. J. 734.

We come then to the question as to whether or not the ultimate relief sought, *i. e.*, a judgment for support, is within the power of any equity court to grant. In *Craig v. Shea,* 102 Neb. 575, 168 N. W. 135, such an action was held to be properly maintainable in equity against a living alleged father. May an action in equity be maintained against the representative of the estate of a deceased alleged father by children born out of wedlock to obtain money for their support, maintenance and education for the period subsequent to the father's death?

At common law the father is under no legal liability to support his children born out of wedlock. 7 C. J. 955; 10 C. J. S. 84, sec. 18 (c) ; 7 Am. Jur. 673, sec. 69. This is conceded by the plaintiffs to be the common-law rule. Plaintiffs argue that we should refuse to follow the common-law rule and hold that present day conditions and needs require that the father of a child born out of wedlock is under a nonstatutory obligation to support the child. Plaintiffs cite *Doughty v. Engler,* 112 Kan. 583, 211 Pac. 619, 30 A. L. R. 1065. The Kansas court has, however, held that their decision is a minority view. See *Myers v. Anderson,* 145 Kan. 775, 67 Pac. (2d) 542. That case goes no further than to hold that the living father is so liable.

Plaintiffs next argue that there is a statutory liability for support, basing their contention on our decision in *Craig v. Shea, supra.* In that case the child of a married woman sought in equity a decree determining her father, and for support from her alleged father. We there held that under the provisions of the pauper's statute, now as amended, section 68-101, Comp. St. Supp. 1941, and the child abandonment act now section 28-458, Comp. St. 1929, the plaintiff

was entitled to support from the actual father. We held that "the legislature intended to *remove* the restrictions imposed by the common law, to *impose a duty not theretofore existing*" and that "the burden of support of an illegitimate child of a married woman should, as in the case of an illegitimate child of an unmarried woman, be cast upon the man responsible for its existence." The decision recognized that the common-law nonliability rule was in force in Nebraska, save as modified by statute, and held that it had been changed by legislative action only, however, to the extent to cast the burden of support of a child born out of wedlock to a married woman upon the father "as in the case" of such a child born to an unmarried woman. The decision does not go beyond that point and does not hold that the estate of the father, when deceased, is liable for that support in an action brought after the alleged father's death. The burden at that time upon the person adjudged to be the father of the child of an unmarried woman was to "stand charged with the maintenance thereof in such a sum or sums as the court may order and direct, * * * and * * * to give security to perform * * * " and if he failed to give such security "he shall be committed to the jail * * * to remain till he shall comply with the order." Rev. St. 1913, sec. 362. Such statutes are generally regarded as the exclusive basis of liability. 7 Am. Jur. 673, sec. 69; 10 C. J. S. 84, sec. 18 (c).

In the absence of a statutory provision a bastardy proceeding does not survive against the personal representative of an alleged father. 7 Am. Jur. 691, sec. 100; 7 C. J. 972; 10 C. J. S. 150, sec. 47. Under the holding in *Craig v. Shea, supra,* the child of a married woman born out of wedlock was held to be entitled to the same right of support as a child born to an unmarried woman. To hold that plaintiffs had a cause of action against the estate of a deceased father would be to accord to them a greater right of support than that granted to the child of an unmarried woman. There is no statutory basis for such a holding.

But plaintiffs argue that they have a continuing right to

support, that they could have proceeded against their father in his lifetime to compel that support, that it was not done because he willingly furnished it and that we should grant the support order against the estate. This we may not do. There is no authority in law for so doing. To grant these plaintiffs that relief would be to accord to children born out of wedlock greater rights than accorded by law to children born in wedlock. Children born in wedlock also have a continuing right to support during the father's lifetime, but they have no rights after his death save those that are granted by will or by statute to be accorded to them in the administration of the estate of the deceased father.

Throughout plaintiffs' brief runs the argument that we should, by judicial opinion, set aside the established rules of the common law as no longer in accord with the public policy of the state, and declare rules that would permit these plaintiffs to have support and maintenance from the estate of their father in this proceeding. This question, as other questions, must be determined as a matter of law, not sentiment.

The questions of the descent and distribution of estates and the care and maintenance of children of a deceased parent are matters determined by statutory provisions. The legislature has determined those matters and their acts constitute the determined public policy of this state. The legislature has determined when a child born out of wedlock may inherit property and who shall be his heirs. Comp. St. 1929, secs. 30-109, 30-110. Provision is made for punishment of the parent who abandons such a child. Comp. St. 1929, sec. 28-458. The legislature in 1941 enacted a comprehensive act to provide among other things "for the support of children born out of wedlock." Laws 1941, ch. 81, Comp. St. Supp. 1941, secs. 43-701 to 43-717. The legislature did not in the act provide for "support" under the circumstances here shown. This act goes only to the extent of providing: "Any judicially approved settlement or order of support made by a court having jurisdiction in the

premises shall be binding on the legal representatives of the father or mother in the event of his or her death, to the same extent as other contractual obligations and judicial judgments or decrees." Comp. St. Supp. 1941, sec. 43-710. The act clearly presupposes action brought against and orders operating on the alleged father during his lifetime, and fastens an obligation upon his estate only in those cases that have proceeded to a "judicially approved settlement or order of support made by a court having jurisdiction in the premises." No such settlement or order was had here during Carlson's lifetime. This act is the last expression of legislative policy in the matter. We are not authorized to extend the provisions of the statute in the manner here requested.

It necessarily follows that an equity court does not have the power to grant the ultimate relief here sought.

Here plaintiffs seek a decree determining that they are the children of Nels Carlson, deceased, "in order that liability for her (their) care, support, maintenance and education and the amount necessary and required for such purpose may be adjudged and decreed herein against the estate" of Carlson.

Has the district court, and this court on appeal, the jurisdiction to determine that foundation question?

By the provision of section 20-21,140, Comp. St. 1929, commonly known as the declaratory judgments act, the district court and this court have power "to declare rights, status, and other legal relations whether or not further relief is or could be claimed." Under such acts it has been determined that the courts have jurisdiction to determine the parentage of a child. *Morecroft v. Taylor*, 225 App. Div. 562, 234 N. Y. Supp. 2; *Miller v. Currie*, 208 Wis. 199, 242 N. W. 570. The objection of the Consul to the jurisdiction of the court over the subject-matter was accordingly properly overruled, and the demurrers were properly overruled.

The declaratory judgment act clearly gives the courts a discretion as to whether or not the jurisdiction to declare a

"status" shall be exercised. The courts are not in accord on criteria by which it may be determined whether or not the discretion shall be exercised. See Borchard, Declaratory Judgments, Part II, ch. V, Discretion, p. 293. It has been generally held that the granting of declaratory relief is a matter within the judicial discretion of the court, to be exercised or not according to the circumstances of the case under consideration. Annotation, 87 A. L. R. 1212.

This record discloses that the estate of Carlson is being administered in the county court of Wayne county, a court that has "original jurisdiction in all matters of probate, settlement of estates of deceased persons," etc. Const. art. V, sec. 16; and that there are pending in that administration proceeding contingent claims (their nature not disclosed) filed on behalf of these two plaintiffs. It may well be that the county court, in the proper exercise of its "original jurisdiction" may be called upon to determine the question of whether or not plaintiffs are the children of the deceased Carlson. That court, in such an event, should not be confronted with a decision of this court, determining that question. We accordingly decline to determine that question in this proceeding.

The judgment of the trial court must accordingly be reversed and the action dismissed for the reasons here stated.

REVERSED AND DISMISSED.

PAINE, J., dissenting.

The opinion adopted in this case seems to imply that under the law these two little girls born out of wedlock can only be supported as paupers by county authorities. I believe that the equity powers of the district court are broad enough to give them an allowance from the estate of their father, who was proud of them, had gladly taken care of them, as a father should, while he lived, and had died expecting they would share in his estate, as he had told several of his friends.

I desire to set out additional details and facts from the bill of exceptions, which shows that on September 3, 1929, Helen Kahler signed a complaint in the county court for

Dixon county against her husband, Ed Kahler, for nonsupport. On November 14, 1930, he entered a plea of guilty, and judgment was entered against him for $220 in favor of Dixon county. Thereafter she again lived with her husband for some months, and on August 13, 1931, a son, Edwin Albert, was born to this union. Her husband deserted her, and has not been seen since. Then the mother and her two children lived with her sister, Martha Klaner, on a farm.

In May, 1932, Nels Carlson came there and employed her as his housekeeper on his farm for $3 a week and also board of her two children. She testified that she did the housework, tended chickens, and helped Nels with the chores, but he never asked her to do field work. He took Helen Kahler and her children on trips to Norfolk and Sioux City and to the neighbors, and they did their shopping in Wayne.

Helen Kahler testified that when she went there she slept in the bed downstairs and he slept upstairs, but in December, 1932, he moved downstairs, and they slept in the same bed as husband and wife continuously until his death October 9, 1940, and that Doris Fay Carlson was born to them October 4, 1933, and Alma May Carlson was born December 18, 1938.

Nels Carlson took Helen to the hospital at Wayne when each of his girls was born. He told the doctor they were his daughters, and he said their names were Carlson, not Kahler. His name was written in, as the father of each, in the birth certificates, copies of which were filed in the vital statistics records. Dr. Lutgen, owner of the hospital, said he told Nels Carlson that he ought to get married, and Carlson said he was ready.

Nels Carlson told Dave Holstrum, a hired man on the farm, "You have known me quite a while, I am going to protect them two kids of mine." He told Albert Beck, the brother of Mrs. Kahler, he would marry her if she got a divorce, and that the two children were his and he would take care of them, and he "didn't have anything to worry about." The children called him "Daddy."

Nels took out two policies of health and accident insurance on August 27, 1940. He made his own policy payable to "Helen Anna Carlson, Wife," and gave his age as 52. In the policy he purchased for Helen Anna Carlson, age 34, he made it payable to himself, "Nels Carlson, Husband." The policies are attached as exhibits Nos. 5 and 6.

Nels Carlson took Helen and their oldest daughter to the home of the pastor of the church of which he was a member and introduced Helen as his wife.

Exhibit 3-a is the "Certificate of Baptism," reading: "This certifies that Doris Fay child of Nels Carlson and his wife Helen born at Wayne, Nebr. Oct. 4, 1933 was baptized in Wakefield, Nebr. on the 23rd day of Nov. in the year of our Lord 1934 * * * . Witnesses: Mrs. Augusta Ohlquist Arthur L. Peterson Pastor"

Burr R. Davis, county attorney, and sheriff Pile had a conversation with Nels at the hospital when the second child was born. Nels told them that the two younger children of Helen Kahler were his children, and her two older children were not. The sheriff testified that later they both went out to Mr. Carlson's farm, and Mrs. Kahler went out in the field with them to where Mr. Carlson was plowing. Nels said that as soon as he got a little money he would see that she got a divorce and he would marry her. The deceased stated to several persons that these two children of his would inherit his property.

In the decree entered by the trial court it was found that it was impossible for said Ed Kahler to have had access to the said Helen Kahler, and impossible for him to have been the father of said Doris Fay Carlson or said Alma May Carlson, plaintiffs herein, and that he is not the father of said children or either of them. The court found further that said Nels Carlson, now deceased, was the father of said children and each of them; that said children and each of them are without property or funds, and are public charges, and are now being supported and maintained at public expense; that said Helen Kahler, mother of said children, is without property or funds, or means of support,

and is a public charge; that said Nels Carlson, deceased, left surviving him no issue or persons dependent upon him for support except his said children above named; that his estate is solvent, and comprised of sufficient property for the proper support, maintenance and education of his said children, and that his said estate, and the property thereof, is legally liable and responsible for the same. The court found that the sum of $3,250 is a just, reasonable and proper amount for the support, maintenance and education of said children, the plaintiffs herein, and directed that a copy of the decree be filed in the county court where administration proceedings are pending in the estate of Nels Carlson.

The action was brought against the administrator of his estate, and G. Oldenburg, Consul of Sweden, intervened, representing the three sisters and one brother of Nels Carlson residing in Sweden.

The only piece of evidence offered by those contesting the allowance of support to these two little girls was the evidence of Anna Nelson, a sister of Nels, and her husband, who testified that Nels was at their house one evening and said: "If Mrs. Kahler wants to raise kids she has to pay her own bills and hospital bills 'it aint my kids'."

This exact recitation by both of them was the substance of their entire evidence. The strength of this evidence is weakened by the fact that it is contrary to all the other witnesses, and weakened further by the fact that Nels had already at that time willingly paid the doctor bills for the birth of these children, and perhaps the fact that the administrator has an old $2,000 note to collect for money Nels had loaned to them might well be considered in weighing their evidence. No other evidence was offered by the defendants.

In regard to the many statements made by Nels Carlson to the doctor at the time of each confinement, to the minister of his church at the time of baptism, to the hired man who worked for him, and to neighbors that the plaintiffs were his own children, and he was their father and would support them, I quote a statement by Cardozo, C. J., in de-

ciding a bastardy case in New York: "Admissions by the spouses out of court are on the same plane in this regard as testimony in court. * * * There may be 'acts and conduct' * * * 'tending, as part of a series of *res gestæ*, to throw light upon and to lead to a just conclusion upon a question on which they would not directly be permitted to give evidence'." *In re Findlay,* 253 N. Y. 1, 170 N. E. 471.

Judge Cardozo also in this case discussed at length all the old rules of paternity now set aside, beginning with the rule that, if the husband was within the four seas, the child was legitimate, which was exploded in *Pendrell v. Pendrell,* 2 Strange, 925, decided in 1732. Nor do we adhere, he said, to Lord Campbell's dictum that a mulatto child born of a white mother must be ascribed to the white father. He also cited the case of *Nolting v. Holt,* 113 Kan. 495, 215 Pac. 281, 31 A. L. R. 1117, in which two mulatto sons were allowed to recover the real estate from the estate of their father, a Negro.

The old common law treated the child of parents not married to each other as *nullius filius,* the son of no one, of no father and no mother, that is, it just ignored its existence. But the whole of the common law is not, and never has been, in force in Nebraska. *Delaney v. Errickson,* 10 Neb. 492, 6 N. W. 600; *Bishop v. Liston,* 112 Neb. 559, 199 N. W. 825. The common law exists only where applicable, and not inconsistent with the laws of the state. *In re Estate of Grainger,* 121 Neb. 338, 237 N. W. 153.

Two cases from English courts are in point. In a bastardy case in 1887 in the Queen's Bench division, opinion by Jessel, M. R., it was held: "The court in deciding who is to have the custody of an illegitimate infant considers what is for the benefit of the infant." *Reg. v. Nash,* 31 Weekly Rep. 420.

In *Ex Parte Haycock,* 5 Russ. *154, 38 Eng. Rep. 985, decided by the Lord Chancellor (Lyndhurst) on June 24, 1828, a proper allowance was made out of a lunatic's estate for four illegitimate children of the lunatic. In this opinion reference is made to a decision of Lord Eldon and two

other decisions, in which yearly sums had been appropriated for the benefit of illegitimate children.

Equity has always had the power to make the remedy meet the need. It will not be limited by technicalities by which wrong or injustice shall be meted out to helpless little ones. This court said: "General equity jurisdiction is vested in the district courts of this state by the terms of our Constitution, and such jurisdiction is beyond the power of the legislature to limit or control." *Burnham v. Bennison*, 121 Neb. 291, 236 N. W. 745.

"The district courts of this state, being courts of general equity jurisdiction, are not limited in the exercise of such jurisdiction by statute." *Cochran v. Cochran*, 42 Neb. 612, 60 N. W. 942.

We are cited to section 30-801, Comp. St. 1929, as prohibiting this form of action against the administrator. This is not an action in the first place for the recovery of money, but each of these daughters as plaintiff first prays that she may be found, adjudged and decreed to be the daughter of Nels Carlson.

If they cannot each establish this question of paternity, their rights to support out of their father's property would fail, and such rights are established in an equity suit by the decree of the district court.

The new laws adopted in 1941 specifically provide for such proceedings in the district court. Comp. St. Supp. 1941, secs. 43-706, 43-711. See *Parker v. Luehrmann*, 126 Neb. 1, 252 N. W. 402, in which claims on bank stock liability are first allowed in the district court.

It is true that generally under the old common law children could be abandoned to starve, and opinions in twelve of our states, cited in 30 A. L. R. 1071, hold that a father is not bound to support his illegitimate child. However, in that old textbook, Puffendorf, Nature, bk. 4, ch. 11, sec. 4, from which Blackstone frequently quotes, we find these statements: "But we are rather inclined to think that parents lie under a perfect obligation to maintain their children, so long as they are unable to maintain themselves;

and this duty seems to be laid upon them, not only by nature itself, but by their own proper act, in bringing them into the world. For they would be in the highest manner injurious to their issue, should they have given the children life, for no other reason, but that they might afterwards see them perish. By the act of generation therefore they seem to have voluntarily bound themselves, to endeavor as far as in them lies, that the life which they have bestowed shall be supported and preserved. And thus the children will have a perfect right of receiving maintenance from their parents."

And again in section 6 it reads: "Farther, maintenance is due not to legitimate children alone; but to natural, and even to incestuous issue. For what reason is there that the poor innocent infant should be suffered to famish for another's sin?"

These quotations are taken from the case of *Doughty v. Engler*, 112 Kan. 583, 211 Pac. 619, 30 A. L. R. 1065, in which the Kansas court took the more enlightened view, and held: "The father of an illegitimate child too young to care for itself is under a nonstatutory obligation to support it, which may be enforced in an action brought by it through its next friend."

Our Nebraska court, in the interest of good morals, has also held that the common-law rule has been abrogated, and that the illegitimate child of a married woman, living separate and apart from her husband, is entitled to support from the actual father by a suit in equity for support and maintenance. *Craig v. Shea*, 102 Neb. 575, 168 N. W. 135.

If a district court can force the father of a child born out of wedlock to support, maintain, and educate such child against his will or wish, it would be a tragedy if the powers of an equity court are not broad enough to charge the education and support against the estate of the father who, in the case at bar, gladly supported his two children, born out of wedlock, as long as he lived.

The opinion adopted holds that an equity court does not have the power, in the absence of statutory authority, to

charge the estate of a deceased father with the support of his children born out of wedlock. With that holding I respectfully disagree, and in my opinion the trial court was right.

YEAGER, J., concurring.

I respectfully submit that the inadvertences of the dissent in this case should not go unchallenged.

In the first sentence of the dissent the writer says: "The opinion adopted in this case seems to imply that under the law these two little girls born out of wedlock can only be supported as paupers by county authorities." This is far from a correct reflection of the holding of the opinion. The opinion holds only that a court of equity has no power to charge the estate with their support.

Whether or not the evidence is sufficient to satisfy the requirements of statute (Comp. St. 1929, sec. 30-109) with regard to acknowledgment of parentage by the deceased so as to permit these children to take as heirs is not a question for determination by a court of equity. That is a matter for determination under the probate power of the county court. Possibility of participation in the estate, and incidentally in that manner obtaining support, is not foreclosed by the majority opinion.

It may be pertinent to remark that if these children are entitled to take as heirs the evidence would indicate the entire estate would descend to them since there is no widow and no other children.

The statement in the dissent that "Equity has always had the power to make the remedy meet the need" is both fallacious and injudicious. It does not reflect accurately or fairly the design or functioning of equity jurisprudence.

The equity courts, the dissent to the contrary notwithstanding, have never assumed to override or put at naught the law or to invade the jurisdiction properly conferred by Constitution and statute upon courts of probate.

The dissent would have this court hold that the district court in equity has power to charge the estate of the decedent with the support of these children nothwithstanding

the statutes make full provision for descent and distribution and presentation and proofs of claim, and notwithstanding heirship and claims against estates are matters over which the county court, and not a court of equity, has jurisdiction.

Even if we were to assume that the evidence was sufficient to entitle these children to support under section 30-1301, Comp. St. 1929, or section 30-109, Comp. St. 1929, the determination of that matter and the amount of money or property to be impounded or awarded would still be a matter within the jurisdiction of the county court sitting in probate.

The cases cited in the dissent do not justify the implications drawn from them. The case of *Pendrell v. Pendrell,* 2 Strange, 925, deals only with the rules of paternity, an incidental question not determined in the present case. The case of *Nolting v. Holt,* 113 Kan. 495, 215 Pac. 281, is authority for recovery by two illegitimate children from a deceased father's estate. The only questions determined were: Are the plaintiffs the children of James Holt, and, had he generally and notoriously recognized them as his children? An affirmative finding on these issues, under the Kansas statute, was sufficient to make the illegitimate children the heirs of the father. We have no such statute. In *Ex parte Haycock,* 5 Russ. 154, 38 Eng. Reprint, 985, the allowances were adjudged against the estate of a lunatic father. But it is specifically stated therein that such an allowance could not defeat a bequest in the will. The dissent cites sections 43-706 and 43-711, Comp. St. Supp. 1941, in support of the position therein assumed. These sections deal only with the establishment of paternity and allowances of support against a living father. If they meant as much as implied in the dissent, they would be evidence only that they were enacted to provide a remedy which had not before existed, and it is conceded by all parties that the case at bar is governed by the law existing prior to the passage of this legislation. The quotations from *Doughty v. Engler,* 112 Kan. 583, 211 Pac. 619, and Puffendorf, Nature, bk. 4, ch. 11,

sec. 4, constitute an enlightening discourse upon the obligations of a father to support his children, legitimate or illegitimate, during his lifetime, but they have absolutely no application in determining the rights of illegitimate children as heirs of the father or their right to support from the estate of the deceased father.

· The dissent overlooks the fact that the descent and distribution of estates is purely statutory and asserts that "it would be a tragedy if the powers of an equity court are not broad enough to charge the education and support against the estate of the father who, in the case at bar, gladly supported his two children, born out of wedlock, as long as he lived." While the temptation to engage in judicial legislation is ofttimes great, it is the solemn pledge of this court to limit itself to the judicial function and to reserve to the legislature those things which are contained within the legislative power. To do otherwise amounts to nothing more than judicial usurpation of authority. I submit that it would be a gross violation of this fundamental rule to judicially enact into law that which the legislature has declined to do.

As one of the majority I do not yield to the writer of the dissent in my solicitude for the welfare of these or any other children born out of wedlock, but my solicitude will not permit me to override plain provisions of law and fundamental principles and conceptions of equity in their interest. My solicitude will not permit me to concur in a precedent, the application of which, when there are both legitimate and illegitimate children, would favor the illegitimate over the legitimate.

I concur in the majority opinion.