S. L. W., by and through his Mother and next friend, and S. G. W. (Deceased), Appellants,

v.

ALASKA WORKMEN'S COMPENSATION BOARD et al., Appellees.

No. 1333.

Supreme Court of Alaska.

Nov. 5, 1971.

L. Ames Luce and Allen L. Jewell, Hahn, Jewell & Farrell, Anchorage, for appellants.

Charles P. Flynn, Burr, Pease & Kurtz, Anchorage, for appellees.

Before BONEY, C. J., and DIMOND, RABINOWITZ, CONNOR and ERWIN, JJ.

CONNOR, Justice.

The question presented is whether an illegitimate posthumous child can recover workmen's compensation death benefits. What makes the case unusual is that the father had no actual knowledge of the pregnancy. He was killed before being informed.

The deceased, a 29-year-old ironworker, was killed on March 28, 1967, while working on a construction project on the Nenana River. On August 10, 1967, a woman 19 years of age gave birth to a male child. She named him S.L.W. after the deceased. A claim for death benefits was filed on behalf of the child about 18 months later. The reason given for the delay was "[b]ecause employee was not married[,] no one advised [his] fiancee that she could make a claim for the child."

At a hearing before the Alaska Workmen's Compensation Board the mother's testimony was uncontradicted. She testi-

fied that she met the deceased in Anchorage in early January, 1967. They dated steadily, became serious about the relationship, and began seeing each other every evening. They often discussed marriage. Decedent planned to be in Nenana no longer than a month and they planned to be married as soon as possible after his return. They first had sexual intercourse about the end of January. After she met decedent, she had sexual connection with no other person.

At no time did decedent and the expectant mother live together. She continued to live at home, while decedent shared an apartment with another man. He made no contribution toward her living expenses.

She discovered her pregnancy shortly before deceased left for the construction job in late February or early March of 1967. She stated that she was initially so embarrassed that she confided in nobody except a girl friend, intending to inform decedent after his return. Although the couple corresponded frequently, she did not mention her pregnancy. When he was killed, deceased was scheduled to return within two or three days. It is undisputed that he did not know of the pregnancy.

S.L.W. was born two months prematurely.[1] On the birth certificate the baby was given decedent's last name, decedent was listed as the father and the mother was listed as decedent's wife.[2]

The board found:

"no evidence which would lead it to believe that the deceased [S.G.W.] was not the father of [S.L.W.] born August 10, 1967; however, it finds no evidence that the deceased had knowledge of his pending fatherhood or that the child was dependent upon the deceased at the time of death."

The board then concluded that AS 23.30.-265(4) "requires an illegitimate child to be acknowledged and dependent upon the deceased," and that since neither knowledge, a prerequisite for acknowledgment, nor ac-

tual dependency could be shown, benefits must be denied. The chairman clarified the board's opinion in a letter to the child's attorney: "[T]he Board's denial is based on its interpretation of a statute and not on evidence as to whether the deceased was the father of the child."

The child appealed to the superior court, and the employer moved for summary judgment in its favor. The superior court judge specifically refused to disbelieve any of the testimony offered before the board. However, because AS 23.30.-265(4) enlarges the common law definition of "child", the judge felt constrained to read the statute narrowly, although normally the Alaska Workmen's Compensation Act is read liberally to effectuate its beneficent purposes. Therefore, though his sympathies lay entirely with the mother and child, he, too, could find neither dependency nor acknowledgment as a matter of law. Accordingly, he entered summary judgment for the employer. Perhaps as a result of the superior court's suggestion that a final determination be sought from this court, this appeal followed.

Our workmen's compensation law, AS 23.30.215(a) (3), provides death benefits for the surviving "child" of the deceased employee. That term is further defined in AS 23.30.265(4) as follows:

"'Child' includes a posthumous child, a child legally adopted before the injury of the employee, a child in relation to whom the deceased employee stood in loco parentis for at least one year before the time of injury, and a stepchild or acknowledged illegitimate child dependent upon the deceased, but does not include married children unless wholly dependent upon him;"

The first question presented is whether a posthumous illegitimate child can recover benefits under this definitional language. Appellee's argument, in summary, is that the legislature did not mention such children expressly, and that this indicates an

---

1. The parties stipulated that the child was born two months prematurely.

2. The application form required that this information be certified as correct.

intention that they shall not be eligible to receive compensation. We do not think that the problem can be disposed of that neatly.

The statute plainly makes acknowledged illegitimate children eligible for benefits. So illegitimacy of itself is not an invariable bar to recovery. Neither is it a bar that one is born after the death of his parent, as posthumous children are expressly included. The real question is whether we must conclude that "posthumous child" can mean only "posthumous legitimate child". If we were to employ an *expressio unius* approach, we could hold that the mention of one type of illegitimate child, i. e., an acknowledged one, excludes any other type from the coverage of the statute.

Courts in other jurisdictions have been unwilling to construe such statutory language in so narrow a fashion. Not only is there a general policy of applying the coverage provisions of workmen's compensation acts broadly, but one can also discern in the case law a conscious purpose of giving illegitimates the benefit of inclusive terminology. Thus in Morgan v. Susino Construction Co., 130 N.J.L. 418, 33 A.2d 607 (1943), aff'd per curiam at 131 N.J.L. 329, 36 A.2d 604 (1944), where the statute mentioned both posthumous children and illegitimate children, a posthumous illegitimate child was held entitled to recover benefits.

In Texas Employers' Insurance Ass'n v. Shea, 410 F.2d 56 (5th Cir. 1969), under the Longshoremen's and Harbor Workers' Act, from which the Alaska act is drawn, the court held that an acknowledged illegitimate child, also posthumously born, was covered. The court rejected the argument that only a posthumous legitimate child can

recover and that an acknowledged illegitimate child cannot recover if he is born posthumously. It characterized such reasoning as "tedious", "tortuous", and "meritless". 410 F.2d, at 61.

The situation in *Shea* was the converse of the case at bar. There the child was acknowledged, here it was not. But the same reasoning process is applicable in each instance. The gist of the matter is that the mention of acknowledged illegitimate children in our statute does not prevent appellant from qualifying as a "posthumous child", if that term can fairly be applied to him.[3]

Appellee contends that S.L.W. cannot claim to be a "posthumous child" because the word "child" when used without amplification is normally understood to mean only a legitimate child. The argument proceeds from the premise that at common law illegitimate children were not recognized for any purpose as the children of their father. Because that rule works harsh results, legislatures have granted rights to illegitimates by naming them in particular statutes. The implication of this argument is that unless we limit the term "child" to only legitimate children we will be doing violence to the legislative intent, as the lawmakers undoubtedly relied upon the common law meaning of the term in drafting the statute. In effect we are asked to bar illegitimates from the status of "children" unless the legislature has expressly mandated that denotation each time that it mentions "child" or "children" in an enactment.

The main difficulty with this argument is that it assumes too great a fixity in both the common law and the meaning of the word "child." It is quite reasonable, espe-

---

3. It is quite likely that acknowledgment was mentioned in the statute because it is a typical method of legitimation. But legitimation can occur under our statutes by other means: subsequent intermarriage of the parents or through a judgment of the superior court. AS 25.-20.050. A child legitimated other than by acknowledgment would not be an "acknowledged illegitimate child". Compartmentally speaking, such a child might have to claim as a "posthumous child" or in some other way. If "posthumous child" were applied only to children born in wedlock, a substantial class might be excluded by a rigid interpretation of the term "acknowledged illegitimate child".

cially to the lay mind, to consider a man's natural child as his child. In various instances courts have held illegitimates to be comprehended within the statutory term "child" or "children", when used without further qualification. Texas Employers' Insurance Ass'n v. Shea, supra; United States v. Philippine National Bank, 110 U. S.App.D.C. 250, 292 F.2d 743 (1961) (per Edgerton, J.); Green v. Burch, 164 Kan. 348, 189 P.2d 892 (1948); La Blue v. Specker, 358 Mich. 558, 100 N.W.2d 445 (1960).

In medieval times land, the main form of wealth, was heavily subjected to feudal tenures and the creation of complex future interests. Absolute divorce was an impossibility. Given such conditions, but recognizing normal human concupiscence, it was most important that the legal system differentiate sharply between legitimate children and bastards. Were it otherwise the very foundations of economic life and family stability would have been threatened with disintegration. No doubt the doctrine of *nullius filius*—that the bastard was the child of no one, not even of its mother— had its origins in this historic necessity.

Although the feudal tenures properly enjoy a certain ghostlike vitality in the field of property law, we will not reach into this legal reliquary as an aid to interpreting modern social legislation. To do so might well thwart the legislative intent.

It is doubtful that the common law rule can be considered any longer extant in its early form. As we observed in Howarth v. Pfeifer, 443 P.2d 39, 44 (Alaska 1968), per Dimond, J.:

> "The common law is not a rigid and arbitrary code, crystallized and immutable. Rather it is flexible and adapts itself to changing conditions. * * * What may be considered a just disposition of a dispute at one stage of history may not be the same at another stage, considering changing social, economic and other conditions of society."

■ One court has forthrightly overthrown the ancient common law rule and has held that an illegitimate child has an inherent right, apart from any statute, to enforce against its parent an obligation of support. Doughty v. Engler, 112 Kan. 583, 211 P. 619 (1923). But we need not base our solution on such a developmental change in the common law. The legislature has provided the source of decision. Under AS 11.35.100 an illegitimate child is as much entitled to support and maintenance as any other child.[4] By making it a criminal offense for the father of an illegitimate child to wilfully fail to furnish necessary support, the legislature has manifested the public policy of this state. The statute is a source of relational duty on the part of fathers to provide for their illegitimate children. In view of this statute we think that, contrary to the common law rule, it can now be said that an illegitimate should normally be considered the child of both his parents.

■ Under the authorities discussed above, we conclude that the term "posthumous child" includes an illegitimate posthumous child.

The next question is whether the child can be considered sufficiently dependent upon the father to qualify for death benefits. Appellee argues that actual dependency must exist, and that it was not shown here because the parents did not live together and the father at no time contributed to the support of either the mother or child. Texas Employers' Insurance Ass'n v. Shea, supra, is invoked as setting up a derivative test of dependence: the claim of the child is determined by whether the mother is dependent upon the father. Because that is not shown here, appellee contends that the child's claim must fail.

The *Shea* case, however, is distinguishable. The court there found that the child had been acknowledged before the father's death. Therefore, it was necessary under the statutory language to determine wheth-

---

4. AS 11.35.100 specifically makes Alaska's criminal nonsupport act, AS 11.35.010– 090, applicable to putative fathers of illegitimate children.

er dependency existed. Because there the mother cohabited with the father, the court held that to be sufficient. It was not necessary for the court to look at the broader question which is presented to us.

Appellant argues that the statute requires a showing of dependency only as to (1) acknowledged illegitimate children and (2) married children, wholly dependent upon the deceased. We will not adopt that interpretation, as we do not find it necessary to decision. We will assume, without deciding, that dependency is a necessary condition for recovery by a "posthumous child".

■ A child *en ventre sa mere* is legally dependent on both its parents for nourishment and support. Shelley v. Central Woodwork, Inc., 207 Tenn. 441, 340 S.W. 2d 896 (1960), is squarely in point. There the court held that a posthumous illegitimate child was entitled to workmen's compensation benefits as a dependent of the deceased. The court drew upon that state's bastardy statute as establishing the public policy of the state that a father is responsible for the support of his illegitimate offspring. See also LaBlue v. Specker, *supra.*

■ Once it is perceived that an illegitimate can qualify as a "posthumous child", the dependency problem presents little difficulty. For it is an old rule that a child *en ventre sa mere* will be considered a child *in esse,* if it is for his benefit, and he may

thereby rank as a dependent. McLain v. Howald, 120 Mich. 274, 79 N.W. 182 (1899); King v. Peninsular Portland Cement Co., 216 Mich. 335, 185 N.W. 858, 860 (1921). It is comforting to find that England, the cradle of the common law, has long employed this rule in workmen's compensation cases, and holds that posthumous illegitimate children are dependent as a matter of law. Williams v. Ocean Coal Co., [1907] 2 K.B. (Eng.) 422; Orrell Colliery Co. v. Schofield, [1909] A.C. (Eng.) 433. These cases are discussed in La Blue v. Specker, *supra*, 100 N.W.2d at 448, 358 Mich. 558.

Actually it is hard to conceive of a person more totally dependent upon his parents than one who has not yet been born. Unlike a child of tender years, he lacks the capacity to look for help from other sources in the event that his parents fail him. While in the womb he has only the potentiality, not yet the ability, of becoming either an abandoned child or a street arab.

■ We hold that under our workmen's compensation statute a child in the womb, who later becomes a "posthumous child", shall be considered dependent upon the deceased parent as a matter of law. It follows that S.L.W. is entitled to an award of workmen's compensation death benefits.

Reversed and remanded with directions to further remand to the Alaska Workmen's Compensation Board for proceedings in accordance with this opinion.