No. 95,935

State of Kansas/State of Iowa, *ex rel.,* Secretary of Social and Rehabilitation Services, and Ellen Holmes, *Appellants,* v. Timothy R. Bohrer, *Appellee.*

(189 P.3d 1157)

Opinion filed August 8, 2008.

*Randy M. Barker*, of Kansas Department of Social and Rehabilitation Services, argued the cause and was on the brief for the appellant.

*William R. Griffith*, of Wichita, argued the cause and was on the brief for the appellee.

The opinion of the court was delivered by

ROSEN, J.: This is an action under the Uniform Interstate Family Support Act (UIFSA), K.S.A. 23-9,101 *et seq.*, filed by the Kansas Department of Social and Rehabilitation Services (SRS) against the respondent, Timothy Bohrer. SRS seeks reimbursement of child

care assistance paid by the State of Iowa to Ellen Holmes, the permanent guardian of the respondent's minor child, S.B. SRS also seeks an order of future child support and an order requiring Bohrer to provide medical coverage for S.B.

The district court ruled that Bohrer was not liable for child support because the permanent guardianship appointment effectively terminated Bohrer's parental rights and, thus, terminated his duty to support S.B. SRS appealed. A divided panel of the Court of Appeals reversed. *State v. Bohrer*, No. 95,935, unpublished opinion filed August 3, 2007. We granted Bohrer's petition for review and hold that the permanent guardianship appointment was not the equivalent of a termination of parental rights and did not relieve Bohrer of his duty to support S.B. Accordingly, we affirm the judgment of the Court of Appeals reversing the district court.

## Facts

The underlying facts are not in dispute. S.B. was born to Timothy Bohrer and Tracy Saxton (formerly known as) Bohrer on February 28, 1994. They divorced 1 year later, and physical custody of S.B. alternated between them for several years. In 1999, the State of Kansas initiated a CINC proceeding concerning S.B. S.B. was initially placed into foster care, but by February 2001, S.B. was living in Iowa with her maternal great-grandmother, Ellen Holmes.

SRS filed a motion in the CINC case seeking appointment of Holmes as permanent guardian. On May 25, 2001, Bohrer and Saxton consented to Holmes' appointment as the permanent guardian of S.B. The district court appointed Holmes as the permanent guardian. Thereafter, the court released S.B. from SRS custody and closed the CINC case.

## Procedural Background

On March 23, 2005, SRS filed the present suit seeking reimbursement from Bohrer for funds expended by the State of Iowa on behalf of S.B. and an order for future child support and medical coverage. For the time period from February 2001 to November 2005, the state of Iowa provided public assistance to Holmes for the care of S.B. in excess of $10,000.

Bohrer opposed the action, arguing that the appointment of Holmes as S.B.'s permanent guardian, pursuant to K.S.A. 38-1501 *et seq.*, effectively terminated his parental rights to S.B., including his obligation of support. SRS countered that the appointment of a permanent guardian is not the equivalent of a termination of parental rights and does not relieve a natural parent of the obligation to support his or her child. The district court agreed with Bohrer and held that the permanent guardianship terminated Bohrer's obligation to support S.B. SRS appealed to the Court of Appeals.

While the appeal was pending before the Court of Appeals, the legislature enacted the Revised Kansas Code for Care of Children (Revised Code). L. 2006, ch. 200. The Revised Code specifically states that the appointment of a permanent custodian (formerly "permanent guardian") without a termination of parental rights does not terminate the parent's duty to provide child support and medical support. See K.S.A. 2006 Supp. 38-2272(h)(1). After providing the parties an opportunity to submit supplemental briefs on the retroactive application of the recent amendments, a divided panel of the Court of Appeals reversed. The majority applied the provisions of the Revised Code retroactively, holding that the appointment of a permanent guardian under the previous version of the Code did not relieve Bohrer of his common-law duty to support his minor child; therefore, applying the new law retroactively would not prejudice Bohrer's substantive rights. *State v. Bohrer*, slip op. at 11.

Judge McAnany dissented, concluding that under the language of the permanent guardianship statutes in effect at the time, the permanent guardian assumed all parental obligations, including support. Because Bohrer had been relieved of the obligation to support S.B., Judge McAnany believed that retroactively applying the new statute imposing a support obligation prejudiced Bohrer's substantive rights. *State v. Bohrer*, slip op. at D-2-D-3 (McAnany, J., dissenting).

## Discussion

The issue we must determine is whether the appointment of a permanent guardian terminated Bohrer's obligation to support S.B.

Resolution of this issue involves interpretation of the statutes concerning permanent guardianship; thus, our review is unlimited. See *LSF Franchise REO I v. Emporia Restaurants, Inc.*, 283 Kan. 13, 19, 152 P.3d 34 (2007) ("The interpretation of a statute is a question of law over which this court has unlimited review. An appellate court is not bound by the trial court's interpretation.").

*Statutes in effect in 2001*

When the permanent guardianship in this case was created in 2001, the Kansas Code for Care of Children (Code) defined a "permanent guardianship" as

"a judicially created relationship between child and caretaker which is intended to be permanent and self-sustaining without ongoing state oversight or intervention by the secretary. The permanent guardian stands in loco parentis and exercises all the rights and responsibilities of a parent. A permanent guardian may be appointed after termination of parental rights or without termination of parental rights, if the parent consents and agrees to the appointment of a permanent guardian. Upon appointment of a permanent guardian, the child shall be discharged from the custody of the secretary." K.S.A. 2005 Supp. 38-1502(w).

The statutes provided for three different methods of appointing a permanent guardian: (1) by parental consent (K.S.A. 38-1587); (2) after a finding of unfitness but without a termination of parental rights (K.S.A. 2005 Supp. 38-1583[g]); and (3) after termination of parental rights (K.S.A. 38-1584[b][2]). The permanent guardianship in this case was by consent and agreement of the parents, without a finding of unfitness or a termination of parental rights, as provided under K.S.A. 38-1587:

"(a) A permanent guardian may be appointed after a finding of unfitness pursuant to K.S.A. 38-1583 and amendments thereto *or with the consent and agreement of the parents.*
"(b) Upon appointment of the permanent guardian, the court shall discharge the child from the custody of the secretary." (Emphasis added.)

*2006 amendments*

The Revised Code was enacted in 2006 and went into effect January 1, 2007. See L. 2006, ch. 200, sec. 121. The pertinent new statutes are set out below:

K.S.A. 2006 Supp. 38-2202(w) replaced the term "permanent guardian" with "permanent custodian," which is defined as "a judicially approved permanent guardian of a child pursuant to K.S.A. 2006 Supp. 38-2272, and amendments thereto."

K.S.A. 2006 Supp. 38-2272, governing the appointment of a permanent custodian, provides in relevant part:

"(a) A permanent custodian may be appointed:

(1) With the consent and agreement of the parents and approval by the court;

(2) after a finding of unfitness pursuant to K.S.A. 2006 Supp. 38-2269, and amendments thereto; or

(3) after termination of parental rights pursuant to K.S.A. 2006 Supp. 38-2270, and amendments thereto.

. . . .

"(c) Subject to subsection (d), a permanent custodian shall stand *in loco parentis* and shall exercise all of the rights and responsibilities of a parent except the permanent custodian shall not:

(1) Consent to an adoption of the child; and

(2) be subject to court ordered child support or medical support.

. . . .

"(e) Absent a judicial finding of unfitness or court-ordered limitations pursuant to subsection (d), a permanent custodian may share parental responsibilities with a parent of the child as the permanent custodian determines is in the child's best interests. Sharing parental responsibilities does not relieve the permanent custodian of legal responsibility for the child.

. . . .

"(h) If a permanent custodian is appointed after a judicial finding of parental unfitness without a termination of parental rights, the parent shall retain only the following rights and responsibilities:

(1) The obligation to pay child support and medical support; and

(2) the right to inherit from the child.

(3) The right to consent to adoption of the child. All other parental rights transfer to the permanent custodian.

"(i) If a permanent custodian is appointed after termination of parental rights, the parent retains no right or responsibilities to the child."

Just as with the previous statutes concerning permanent guardianship, the Revised Code provides for the appointment of a permanent custodian in three ways: by consent of the parents; after a finding of unfitness but without termination of parental rights; and after a termination of parental rights. Unlike the Code provisions concerning permanent guardianship however, the Revised Code

specifically states that where a permanent custodian is appointed without a termination of parental rights, the parent retains the obligation to support his or her minor child.

*Consideration of amendments made while an appeal is pending*

When an applicable statute is amended while an appeal is pending, and counsel for both sides have had an opportunity to brief and argue the amended statute, the appellate court will consider and construe the amended version of the statute. *State ex rel. Stephan v. Board of Lyon County Comm'rs*, 234 Kan. 732, Syl. ¶ 1, 676 P.2d 134 (1984).

Because counsel for both sides have had an opportunity to file briefs and argue the 2006 amendments to this court, we may consider the new statutes.

*Whether the Revised Code should be applied retroactively*

In determining whether a statute applies retroactively or prospectively, the general rule is that a statute operates only prospectively unless its language clearly indicates that the legislature intended it to operate retroactively. *Owen Lumber Co. v. Chartrand*, 276 Kan. 218, 220, 73 P.3d 753 (2003). However, notwithstanding such clear language, when an amendment to an existing statute or a new statute is enacted which prejudices a party's substantive rights, it will not apply retroactively. 276 Kan. at 221; *Halley v. Barnabe*, 271 Kan. 652, 657, 24 P.3d 140 (2001).

In this case, the Revised Code contains clear language indicating the legislature intended that the 2006 revisions to the Code would apply retroactively as long as doing so would not prejudice the rights of a party:

"In addition to all actions concerning a child in need of care commenced on or after January 1, 2007, this code also applies to proceedings commenced before January 1, 2007, unless the court finds that application of a particular provision of the code would substantially interfere with the effective conduct of judicial proceedings or prejudice the rights of a party or an interested party, in which case the particular provision of this code does not apply and the previous code applies." K.S.A. 2006 Supp. 38-2283(a).

Thus, under both the case law on retroactive application and K.S.A. 2006 Supp. 38-2283(a), we must determine whether apply-

ing the 2006 amendments retroactively would prejudice Bohrer's substantive rights. Substantive laws establish the rights and duties of parties. *In re Tax Grievance Application of Kaul*, 269 Kan. 181, 184, 4 P.3d 1170 (2000). A statute that creates a new liability for child support that did not previously exist establishes a duty and, therefore, affects a substantive right. *Cf. Gardner v. Gardner*, 22 Kan. App. 2d 314, 317, 916 P.2d 43, *rev. denied* 260 Kan. 992 (1996) (applying amendment changing rules for dormancy of child-support judgments retroactively did not affect substantive rights as the amendments affected only the procedure by which the substantive rights are enforced).

It follows then, that determining whether the Revised Code applies retroactively depends upon whether the permanent guardianship extinguished Bohrer's support obligation when it was created in 2001. If it did, then the Revised Code would not be applied retroactively, as doing so would prejudice Bohrer's substantive rights by creating a new liability for child support that did not exist before the amendments. On the other hand, if the permanent guardianship did not terminate Bohrer's duty to support S.B., retroactive application of the amendments is unnecessary as the duty existed and continues to exist and, thus, it can be enforced. Therefore, the issue in this case depends entirely on determining whether the permanent guardianship, under the statutes in effect in 2001, extinguished Bohrer's duty of support.

We note Bohrer's argument that under K.S.A. 2006 Supp. 38-2283(a), the Revised Code only applies retroactively to child in need of care cases, which this is not. We also note Judge McAnany's contention that K.S.A. 2006 Supp. 38-2272(h) would not apply to this case in any event because it states that the parents retain the obligation to pay child support and medical support only where a permanent guardian is appointed after a finding of unfitness. Judge McAnany questions the applicability of the amendments because there was no finding of unfitness in this case. Because resolution of the issue at hand either precludes retroactive application of the Revised Code, or makes it unnecessary, we do not reach these issues.

### The common-law duty of support

Parents have a common-law duty to support their minor children, regardless of any statute imposing such an obligation. See *Grimes v. Grimes*, 179 Kan. 340, 343, 295 P.2d 646 (1956) (holding that a parent may not contract away his or her common-law duty to support his or her minor child). The court in *Grimes* discussed the nature of the common-law duty of support:

" 'By the great weight of judicial opinion in this country parents are under a legal duty, regardless of any statute, to maintain their legitimate minor children (20 R.C.L. 622), the obligation being sometimes spoken of as one under the common law and sometimes as a matter of natural right and justice, and often accepted as a matter of course without the assignment of any reason. . . .

" 'The duty of parents to provide for the *maintenance* of their children is a principle of natural law; an obligation . . . laid on them not only by nature herself, but by their own proper act, in bringing them into the world; for they would be in the highest manner injurious to their issue, if they only gave their children life that they might afterwards see them perish. By begetting them therefore, they have entered into a voluntary obligation, to endeavor, as far as in them lies, that the life which they have bestowed shall be supported and preserved. And thus the children will have a perfect *right* of receiving maintenance from their parents." 1 Blackstone's Commentaries, 447.' " 179 Kan at 343 (quoting *Doughty v. Engler*, 112 Kan. 583, 584, 211 Pac. 619 [1923]).

### Termination of the common-law duty of support

This common-law duty of support continues until the child reaches the age of majority, or until the death of the child or the obligor parent. See *In re Marriage of Schoby*, 269 Kan. 114, 116, 4 P.3d 604 (2000). The common-law duty of support ends, however, if parental rights are terminated. *State ex rel. Secretary of SRS v. Clear*, 248 Kan. 109, 116, 804 P.2d 961 (1991). We have recognized three statutory methods by which parental rights are terminated: (1) adoption, under K.S.A. 59-2111 *et seq.*; (2) termination of parental rights under K.S.A. 38-1581 *et seq.*; and (3) relinquishment of parental rights under K.S.A. 38-125 *et seq.* (now K.S.A. 59-2124). *Clear*, 248 Kan. at 116. Thus, the question is whether the appointment of a permanent guardian under K.S.A. 38-1587 is the equivalent of a termination of parental rights.

We faced a similar issue in *Clear*. In that case, the issue was whether a parent's voluntary relinquishment of parental rights ex-

tinguished the parent's duty to provide child support. To determine the issue, we compared relinquishment of parental rights to adoption and involuntary termination of parental rights—two instances in which parental rights and obligations are severed. We noted that the characteristic hallmark of a termination of parental rights is the " 'final and permanent settlement of all problems of custody and supervision by a complete and final divestment of all legal rights, privileges, duties, and obligations of the parent and child with respect to each other and by replacement of the natural parent by another guardian or adoptive parent.' " *Clear*, 248 Kan. at 115 (quoting *Roelfs v. Wallingford, Inc.*, 207 Kan. 804, 811, 486 P.2d 1371 [1971]).

Applying this standard, we concluded that the effect of a voluntary relinquishment of parental rights, like adoption and involuntary termination of parental rights, is "a complete severance of the child's ties and relationship with his or her natural parents. The parent whose rights have been severed is relieved of all duties and obligations to the child." *Clear*, 248 Kan. at 117. Accordingly, we held that a parent who relinquishes parental rights under K.S.A. 38-125 *et seq.* "is no longer a parent and is not liable . . . to repay SRS for any services or assistance expended on the children's behalf." 248 Kan. at 117.

Permanent guardianship is not one of the statutory means for termination of parental rights identified in *Clear*. Of course, the statutory procedure for appointment of a permanent guardian did not exist at the time of the *Clear* case. SRS argues that in enacting the permanent guardianship, the legislature did not intend to create a fourth method of termination.

The analysis employed in *Clear* provides a good framework for determining whether the appointment of a permanent guardian terminates a natural parent's common-law duty of support. To begin, we look to the language of the permanent guardianship statutes.

"When we are called upon to interpret a statute, we first attempt to give effect to the intent of the legislature as expressed through the language enacted. When a statute is plain and unambiguous, we do not speculate as to the legislative intent behind it and will not read the statute to add something not readily found in it.

We need not resort to statutory construction. It is only if the statute's language or text is unclear or ambiguous that we move to the next analytical step, applying canons of construction or relying on legislative history construing the statute to effect the legislature's intent. See *State v. Robinson*, 281 Kan. 538, 539-40, 132 P.3d 934 (2006); *CPI Qualified Plan Consultants, Inc. v. Kansas Dept. of Human Resources*, 272 Kan. 1288, 1296, 38 P.3d 666 (2002)." *In re K.M.H.*, 285 Kan. 53, 79-80, 169 P.3d 1025 (2007).

Bohrer contends that under the plain and unambiguous language of the permanent guardianship statutes, the permanent guardian stands in the place of the natural parent and assumes all of the natural parent's rights, duties, and responsibilities. First, Bohrer points to the language of K.S.A. 2005 Supp. 38-1502(w), which provided that the permanent guardian "stands *in loco parentis* and exercises all the rights and responsibilities of a parent." Second, Bohrer points to K.S.A. 2005 Supp. 38-1502(d), which defined "parent" to include "*a guardian,* conservator and every person who is by law liable to maintain, care for or support the child." (Emphasis added.)

SRS argues that Bohrer reads too much into the use of the term "*in loco parentis*" by construing it to mean a complete and total transfer of all parental rights, duties, and obligations to the permanent guardian. In support, SRS notes that the term is commonly applied to various third parties such as child care agencies, schools, etc., which, although they are said to stand *in loco parentis,* certainly do not assume *all* parental rights, duties, and obligations. See *Dunn v. U.S.D. 367,* 30 Kan. App. 2d 215, 231, 40 P.3d 315 (2002) (stating that "high schools act *in loco parentis* with respect to [their] students"). Moreover, it does not follow that simply because a person is standing *in loco parentis,* the natural parent is thereby relieved of all of his or her parental rights and duties.

We agree. Parental rights, duties, and obligations are not mutually exclusive. The fact the statute gives the permanent guardian *in loco parentis* status and the power to exercise "all of the rights and responsibilities of a parent" does not necessarily mean that the parent is thereby *relieved* of all parental rights and responsibilities. The focus of the language is on the duties and responsibilities assumed by the permanent guardian; it says nothing about the rights

and duties retained by the natural parent. To determine whether the appointment of a permanent guardian terminates a parent's duty of support, we need to look not only at the rights and obligation assumed by the permanent guardian, but also the rights and obligations retained or lost by the natural parent, as the case may be.

Moreover, the fact that K.S.A. 2005 Supp. 38-1502(d) defined a parent to include "a guardian, conservator and every person who is by law liable to maintain, care for or support the child" is also not a clear and unambiguous indication that the legislature intended a permanent guardianship to essentially transfer all of a natural parent's rights and obligations to the permanent guardian. Because that definition uses the terms "guardian" and "conservator," it is reasonable to conclude the legislature merely intended to include guardians and conservators for minor children appointed under the Act for Obtaining a Guardian or a Conservator, K.S.A. 59-3050 *et seq.*

Because the version of the Code in effect in 2001 does not clearly and unambiguously state whether appointment of a permanent guardian terminates the natural parent's support obligation, we must determine legislative intent through statutory construction. See *In re K.M.H.*, 285 Kan. at 79 (we apply canons of construction or rely on legislative history construing the statute only if the statute's language or text is unclear or ambiguous).

The district court relied heavily on the legislative history behind the permanent guardian statutes in determining the legislature intended a permanent guardianship to be the functional equivalent of a termination of parental rights. As the district court noted, when amendments to the permanent guardianship statutes were being considered in 1999, S.B. 355 included language in the definitional section, 38-1502(w), which specified that a permanent guardianship created without termination of parental rights would not terminate a natural parent's support duty:

"(w) 'Permanent guardianship' means a judicially created relationship between child and caretaker which is intended to be permanent and self-sustaining without ongoing state oversight or intervention. The permanent guardian stands in loco parentis and exercises all the rights and responsibilities of a parent. *When parental*

*rights are not terminated, parents remain responsible for financial support.* Upon appointment of a permanent guardian, the child in need of care proceedings shall be dismissed. A permanent guardian may be appointed after the termination of parental rights." S.B. 355. (Emphasis added.)

This language was removed from the final version of the bill in the conference committee. Sen. J. 1999, p. 955.

This legislative history is not conclusive. We have no way of knowing why the conference committee removed the language concerning the continuing duty to support from the final version of K.S.A. 38-1502(w). As SRS argues, the committee may have believed that the continuing duty of support in circumstances short of termination of parental rights was obvious and thus the language was unnecessary. On the other hand, the district court inferred that the language was removed because the conference committee intended that the appointment of a permanent guardian would terminate the duty of support. It is also possible there was a disagreement over whether a permanent guardianship should terminate a natural parent's duty of support, and the provision was removed to obtain passage. Each of these scenarios are based on nothing more than pure speculation. Thus, the evidence of the removal of the language providing for a continuing duty of support is of little value.

The district court also noted that Sue McKenna, SRS Legal Counsel for Family and Child Services, testified that upon awarding a permanent guardianship, the natural parent remains "the legal parent in name only." Minutes of the House Judiciary Committee, March 12, 1998. SRS argues that the district court placed too much emphasis on the committee's summarization of Sue McKenna's testimony. SRS notes that the summary is not a full record, but is only a highly summarized rendition of the testimony and answers to questions presented that day.

SRS points to other legislative history the district court ignored; specifically, the written testimony of Joyce Allegrucci, representing the Children and Family Services Commission, which was presented to the Senate Judiciary Committee on March 29, 1999. In her testimony concerning S.B. 355, Joyce Allegrucci stated:

"All children deserve to have permanency. This can be accomplished through reintegration with their birth family, adoption, or permanent guardianship. Permanent guardianship is an appropriate permanency option for children in kinship arrangements. These arrangements enable a child to have a safe permanent home *without severing all ties to birth parents* and extended families. Permanent guardianship is also viable for those situations in which a parent has a strong bond with the child but is unable to meet the child's daily needs. SB 355 completes work begun last session of creating a legal framework necessary to support these arrangements. It provides that parents may agree to the appointment of a permanent guardian and clarifies that state oversight ends when the permanent guardianship is established." (Emphasis added.) Minutes of the Senate Judiciary Committee, March 29, 1999.

That testimony does indicate that the legislature may have intended that the parents would retain some parental rights. The comment, however, is a bit vague for our purposes. It must also be considered in conjunction with Sue McKenna's testimony that the natural parent remains a parent in name only. Essentially, these comments are contradictory and, thus, tell us very little about what the legislature actually believed when it enacted the statutes.

SRS argues that the legislative history behind the permanent guardianship shows that "[w]hile the primary tasks of caring for the child are passed to the permanent guardian, and the status of *in loco parentis* is granted to the permanent guardian, the appointment of a permanent guardianship is a lesser event than a termination of parental rights and duties." The legislative history does not *clearly* indicate that permanent guardianship was intended to be a lesser event than termination of parental rights. One thing, though, *is* clear from the legislative history—permanent guardianship was intended to be a permanency *alternative* to termination of parental rights where a willing and capable extended family member existed. See Minutes of the House Judiciary Committee, March 12, 1998, Attachment 1 (stating permanent guardianship "provides an alternative for a permanent family for children when reintegration is not a viable alternative and adoption is not in the best interests of the child); Minutes of the House Judiciary Committee, March 12, 1998 (testimony of Sue McKenna stating permanent guardianship is for extended kinship situations); Minutes of the Senate Judiciary Committee, March 29, 1999, Testimony of

Joyce Allegrucci, Attachment 1 (stating "[p]ermanent guardianship is an appropriate permanency option for children in kinship arrangements").

Whether this alternative was intended to have the same legal effect as a termination of parental rights is not answered by the legislative history. Thus, the answer to the question presented in this case lies, as it did in *Clear*, in the comparison of the consensual permanent guardianship with the termination of parental rights found in adoption, voluntary relinquishment of parental rights, and involuntary termination of parental rights.

### Adoption

K.S.A. 59-2118(b) describes the effect of adoption:

"When adopted, a person shall be entitled to the same personal and property rights as a birth child of the adoptive parent. The adoptive parent shall be entitled to exercise all the rights of a birth parent and be subject to all the liabilities of that relationship. *Upon adoption, all the rights of birth parents to the adopted person, including their right to inherit from or through the person, shall cease,* except the rights of a birth parent who is the spouse of the adopting parent. An adoption shall not terminate the right of the child to inherit from or through the birth parent." (Emphasis added.)

See also K.S.A. 59-2136(i) (in termination of parental rights through adoption, "all rights of the birth parents to such child, including their right to inherit from or through such child, shall cease").

As the court found in *Clear*, the adoption statutes contain the hallmark of a termination of parental rights:

"Our adoption statutes contemplate a complete severance of the child's ties and relationship with his or her natural parents. The natural parent is relieved of all duties and obligations to the child. The effect of a decree of adoption is to confer a legal status of parent and child upon adoptive parents and adopted children, including the legal consequences, obligations, and incidents that arise out of the status of parent of the child." *Clear*, 248 Kan. at 116.

### Voluntary relinquishment of parental rights

K.S.A. 59-2124, concerning relinquishment of a child to an agency, provides for a complete termination of all parental rights, including the right to notice of subsequent adoption proceedings and the right to inherit from or through the child:

"(d) Except as otherwise provided, in all cases where a parent or person *in loco parentis* has relinquished a child to the agency pursuant to K.S.A. 59-2111 through 59-2143, and amendments thereto, *all the rights of the parent or person in loco parentis shall be terminated, including the right to receive notice in a subsequent adoption proceeding involving the child.* . . . *Upon such relinquishment, all the rights of birth parents to such child, including their right to inherit from or through such child, shall cease.*

"(e) A parent's relinquishment of a child shall not terminate the right of the child to inherit from or through such parent." (Emphasis added.)

See also K.S.A. 2006 Supp. 38-2268(b)(4) (providing that upon voluntary relinquishment, "all the rights of the parent shall be terminated, including the right to receive notice in a subsequent adoption proceeding involving the child" and "all the rights of the parent to such child, including such parent's right to inherit from or through such child, shall cease").

As the court stated in *Clear*, in a voluntary termination by relinquishment, all of the legal consequences, obligations, and incidents that arise out of the status of parent of the child transfer to SRS, the parent who relinquishes is no longer a parent. *Clear*, 248 Kan. at 117.

*Termination of parental rights*

The statutes in effect at the time the permanent guardianship was awarded in this case specifically stated that termination of parental rights terminates all of a parent's rights to the child, including the right to inherit from or through the child and the right to consent to a subsequent adoption:

K.S.A. 2005 Supp. 38-1583(f) provided:

"A termination of parental rights under the Kansas code for care of children shall not terminate the right of the child to inherit from or through the parent. *Upon such termination, all the rights of birth parents to such child, including their right to inherit from or through such child, shall cease.*" (Emphasis added.)

See also K.S.A. 2006 Supp. 38-2269(g)(1) (same).

K.S.A. 38-1584(b) provided:

"(b) *Actions by the court.* (1) *Custody for adoption.* When parental rights have been terminated and it appears that adoption is a viable alternative, the court shall enter one of the following orders:

"(A) An order granting custody of the child, for adoption proceedings, to a reputable person of good moral character, the secretary or a corporation organized under the laws of the state of Kansas authorized to care for and surrender children for adoption as provided in K.S.A. 38-112 *et seq.* and amendments thereto. The person, secretary or corporation shall have authority to place the child in a family home, be a party to proceedings *and give consent for the legal adoption of the child which shall be the only consent required to authorize the entry of an order or decree of adoption.*" (Emphasis added.)

See also K.S.A. 2006 Supp. 38-2270 (authorizing court to grant custody of child for adoption, and for such custodian to give consent for adoption, with no other consents required).

The common thread running through these statutes is that each specifically and expressly addresses the effect that adoption, relinquishment, and termination of parental rights have on the rights and obligations of the parent. Adoption, relinquishment, and termination of parental rights effect " 'a complete and final divestment of all legal rights, privileges, duties, and obligations of the parent and child with respect to each other.' " *Clear*, 248 Kan. at 115 (quoting *Roelfs v. Wallingford, Inc.*, 207 Kan. at 811). In each, the loss of parental rights is complete and expressly includes the termination of the right to inherit from or through the child and the right to notice of and consent to subsequent adoption.

Although the statutes concerning the appointment of a permanent guardian by consent cover the rights, duties, and obligations assumed by the permanent guardian, they do not speak to the effect of such an appointment on the residual rights, duties, and responsibilities of the parent. This is in stark contrast to the adoption, termination of parental rights, and relinquishment of parental rights statutes, which expressly provide that the incidents of the natural parent's relationship to the child are severed. And, we note, it is the absence of this language in the permanent guardianship statutes that the dissent does not address. Instead, the dissent would be satisfied to extrapolate severance from terms like "in loco parentis."

A permanent guardianship appointment without termination of parental rights does not carry the characteristic hallmarks of a termination of parental rights. The legislature did not include in the

permanent guardianship statutes the same language used in the adoption, relinquishment, and termination of parental rights statutes to effect a complete severance of the parent's ties to the child. The legislature is presumed to act with knowledge of existing statutory law and cases. *State ex rel. Board of Healing Arts v. Beyrle,* 269 Kan. 616, 629, 7 P.3d 1194 (2000). If the legislature had intended permanent guardianship to be the equivalent of a termination of parental rights, it certainly knew how to use such language. That it did not is indicative of an intent to make the appointment of a permanent guardian by consent a lesser event than a termination of parental rights.

When this point is considered in conjunction with the legislative history indicating the intent to create a permanency *alternative* to termination of parental rights, it follows that a consensual permanent guardianship under K.S.A. 38-1587 is not the equivalent of a termination of parental rights, but is instead a lesser event. Moreover, as the Court of Appeals noted, "the termination of parental rights is an extremely serious matter and may be accomplished only in a manner which assures maximum protection to all of the rights of the natural parents and of the child involved." *In re A.W.,* 241 Kan. 810, 814, 740 P.2d 82 (1987). To read termination of parental rights into the permanent guardianship statutes, as does the dissent, would result in severance of parental rights without these necessary and important protections, and without any clear indication that the legislature intended such a drastic effect.

In summary, the voluntary and consensual appointment of Ellen Holmes as permanent custodian did not relieve Bohrer of the common-law duty to support S.B. Thus, he had and continues to have the obligation to support S.B. This obligation may be enforced through an action for reimbursement and through an order for future child support and medical coverage. Because the permanent guardianship did not terminate Bohrer's duty to support S.B., retroactive application of the Revised Code is unnecessary.

Accordingly, the decision of the Court of Appeals is affirmed and the district court's decision is reversed. This case is remanded for further proceedings to determine the amount to be reimbursed

to the State of Iowa, and to determine SRS's request for an order of current child support and order to provide medical coverage.

JOHNSON, J., dissenting: I respectfully dissent. I believe the 2006 legislative revisions to the Kansas Code for the Care of Children (hereafter "new code") changed the law with respect to permanent guardianships, and that the prior law under which the instant permanent guardianship was established effected a transfer of the child support duty from the natural parent to the court-appointed permanent guardian. Certainly, the prior law did not contemplate a post-appointment action by the Kansas Department of Social and Rehabilitation Services (SRS) against a natural parent to recoup public assistance payments made to the permanent guardian.

First, it may be helpful to clarify the character of this lawsuit. In the CINC case, SRS petitioned the court under the previous CINC code ("old code") to appoint Ellen Holmes as permanent guardian, which would place Holmes *in loco parentis* of the child, as well as permitting the agency to close its file and discontinue committing resources to the CINC case. See K.S.A. 2005 Supp. 38-1502(w); K.S.A. 38-1587(b). Apparently, Holmes was unable to stand *in loco parentis* with respect to performing the financial responsibilities of a parent and the government was required to provide assistance payments to Holmes. Now, some years later, SRS is suing the natural parent to recoup those assistance payments.

Despite the majority's citation to Blackstone's Commentaries found in *Grimes v. Grimes*, 179 Kan. 340, 343, 295 P.2d 646 (1956) (quoting *Doughty v. Engler*, 112 Kan. 583, 584, 211 Pac. 619 [1923]), this case contains no evidence that the parent " ' "only gave [his child] life that [he] might afterwards see [the child] perish." ' " To the contrary, here we have a parent who took affirmative action to see to the well-being of his child and to provide permanency in that child's life by agreeing to a permanent guardianship. That action was taken at the expense of relinquishing precious parental rights, which at a minimum would include the legal right to visit the child and the right to have any input in the child's education, religion, or medical care.

Next, I am concerned about the majority's declaration that "[b]ecause the permanent guardianship did not terminate Bohrer's

duty to support S.B., retroactive application of the Revised Code is unnecessary." 286 Kan. at 915. As the majority recites, in K.S.A. 2007 Supp. 38-2283(a), the new code specifically provides that it

"applies to proceedings commenced before January 1, 2007, unless the court finds that application of a particular provision of the code would substantially interfere with the effective conduct of judicial proceedings or prejudice the rights of a party or an interested party, in which case the particular provision of [the new] code does not apply and the previous code applies."

To me, that language could not be clearer or more unambiguous; the court is directed to apply either the new code or the old code, depending upon a prejudice analysis.

The majority's finding that Timothy Bohrer had a continuing, post-guardianship duty to support his child under the old code is tantamount to finding an absence of prejudice in retroactively applying the child support provisions of the new code. In that event, retroactive application of the new code is mandated, rather than being rendered "unnecessary." See *Winnebago Tribe of Nebraska v. Kline*, 283 Kan. 64, 77, 150 P.3d 892 (2007) ("When a statute is plain and unambiguous, the court must give effect to the intention of the legislature as expressed, rather than determine what the law should or should not be.").

Apparently, the majority is suggesting that this case is governed by a "natural law" of parental child support that transcends legislative regulation. If my perception of the majority's thinking is accurate, I disagree on more than one level. On a theoretical level, the legislature has the authority to change the common law, so long as it stays within constitutional parameters, and it would trample on the separation of powers doctrine to declare certain common law inviolate.

Factually, this case is distinguishable from *Grimes*, on which the majority relies for its common-law rationale. There, the question was whether the district court, in a divorce action, should have ordered the husband to pay child support to the wife, as required by statute. The husband had argued that, pursuant to a prenuptial agreement, the wife's parents had committed to provide the future support for the child their daughter was then expecting in return for the husband's agreement to enter into the child-legitimizing

marriage. *Grimes'* holding was that the divorce statutes required the trial court to order child support and that "[a] father cannot relieve himself of his common law or *statutory* obligation to support his child by entering into an agreement with a third person to assume that responsibility." (Emphasis added.) 179 Kan. 340, Syl. ¶ 1. Thus, *Grimes* utilized the common-law parental duty to give effect to a legislative enactment, rather than to trump statutory provisions.

Moreover, any suggestion that a natural parent can never enter into an agreement that will relieve the parent of his or her common-law support duty is belied by K.S.A. 59-2124 and by *State ex rel. Secretary of SRS v. Clear*, 248 Kan. 109, 804 P.2d 961 (1991). K.S.A. 59-2124(a) provides that any parent may relinquish a child to an agency if the agency accepts the relinquishment in writing. As the majority acknowledges, *Clear* instructs us that such a relinquishment transfers the common-law duty of child support to the agency without recourse back against the relinquishing parent. In essence, that parent has contracted away his or her legal child support obligation. Indeed, in those cases, there is not even a requirement that the child be in a permanent placement after the relinquishment. Given that, I see no common-law impediment to the legislature providing for the same type of transfer of legal duty in the event the parent agrees to promote permanency for the child through the appointment of a permanent guardian.

The majority does not appear to refute that the old code placed a support duty on the permanent guardian. Rather, the opinion suggests that the natural parent remained under a concurrent or dual duty, apparently of a joint and several nature. I do not find that creative interpretation in the statutory language or in the legislative history.

The starting point for interpreting a statute is to look at the language the legislature used and give effect to the intent indicated by that language. See *Kline*, 283 Kan. at 77. In K.S.A. 2005 Supp. 38-1502(w), the legislature plainly stated: "The permanent guardian stands in loco parentis and exercises all the rights and responsibilities of a parent." The literal translation of the Latin phrase *in loco parentis* is "in place of a parent." Black's Law Dictionary 803

(8th ed. 2004). The majority contorts that phrase to mean in place of a parent for some purposes, but in conjunction with a parent for some other purposes which will be determined by the courts at some future time. Although the majority alludes to how the term is commonly used in other contexts, such as with schools, it fails to cite to the statutory definition contained in the relinquishment and adoption article of our statutes. K.S.A. 59-2112(g) provides that " 'person *in loco parentis*' means an individual or organization vested with the right to consent to the adoption of a child pursuant to relinquishment or an order or judgment by a district court of competent jurisdiction." Therefore, I would find that the legislature's use of the term *in loco parentis* was intended to be more literal than the majority's figurative interpretation.

Likewise, the directive that the permanent guardian is to exercise *all* of the rights and responsibilities of a parent seems eminently clear. One might intuit that if the legislature had intended the natural parent to cede to the permanent guardian most, if not all, of the rights of a parent but retain some of the parental responsibilities, such as child support, it selected a particularly inarticulate and misleading choice of words to convey that intent.

To the contrary, as the majority acknowledges, the legislative history from 1999 belies any suggestion that the legislature did not know how to make its point explicitly, *i.e.*, that the language employed in K.S.A. 2005 Supp. 38-1502(w) was inadvertent or was somehow intended to be read as including an exemption of child support from the package of rights and responsibilities transferred from the parent to the guardian. The legislature had before it the following language in the originally proposed version of the legislation: "When parental rights are not terminated, parents remain responsible for financial support." S.B. 355. However, that sentence was excised from the law the legislature actually passed.

I find the majority's attempt to discount the significance of the legislature's removal of that explicit sentence to be particularly unpersuasive, especially in light of the majority's citation to *State ex rel. Board of Healing Arts v. Beyrle*, 269 Kan. 616, 629, 7 P.3d 1194 (2000), for the premise that the legislature is presumed to act with knowledge of existing statutory law and cases. When the

legislature was considering whether to include the explicit language allocating the child support obligation to the parent, it had the benefit of this court's 1991 decision in *Clear*. As previously described, the *Clear* court found that a relinquishment effected a complete termination of the parent's child support obligation without recourse for SRS's subsequent support payments. One would think that the legislature, with its presumed knowledge of the *Clear* holding, would anticipate the distinct possibility that the courts could construe a permanent guardianship to be akin to a relinquishment so as to likewise completely terminate the parent's support obligation. I cannot believe that the legislature, if it truly intended the parent to remain financially responsible after the appointment of the permanent guardian, would have left that intent to chance by removing the explicit language.

Additionally, I find instruction in the first sentence of the old code definition of a permanent guardianship as "a judicially created relationship between child and caretaker *which is intended to be permanent and self-sustaining without ongoing state oversight or intervention by the secretary."* (Emphasis added.) K.S.A. 2005 Supp. 38-1502(w). The majority does not focus on this language, other than to recite testimony in the legislative history which clarifies that one of the purposes of the legislation was to end State oversight upon establishment of a permanent guardianship. See also K.S.A. 38-1587(b) ("Upon appointment of the permanent guardian, the court shall discharge the child from the custody of the secretary."). Of course, in this case, the permanent guardianship was not self-sustaining from a financial perspective, State oversight did not end, and the Secretary has now intervened to sue the parent who had originally agreed to an arrangement which was then described as "permanent and self-sustaining." I am unable to reconcile this action with the ordinary meaning of the words employed in the statute.

Finally, I am convinced that the new code changed the law with respect to a consenting parent's post-guardianship legal duty to support the child, rather than simply clarifying that the prior legislation was intended to incorporate some notion of a common-law dual duty of support. If nothing else, we could employ the inter-

pretive rule that, when the legislature revises an existing law, the court presumes that the legislature intended to change the law as it existed prior to the amendment. *State v. McElroy*, 281 Kan. 256, 263, 130 P.3d 100 (2006). Nevertheless, I find corroboration for that presumption in the provisions of the new code.

Pointedly, the new code changes the terminology; the caretaker is now called a custodian, rather than a guardian. That change would be consistent with a desire to avoid any confusion as to whether the caretaker under the new code assumes all of the responsibilities commonly ascribed to a guardian legally appointed under other statutory provisions. The provisions of the new code clearly fall short of transferring to the caretaker the full panoply of guardianship responsibilities. That indicates to me that the old code did make such a transfer of responsibilities.

As described by the majority, the new code specifically provides that, if a permanent custodian is appointed after a judicial finding of parental unfitness without a termination of parental rights, the parent retains the legal obligation to pay child support and medical support. K.S.A. 2007 Supp. 38-2272(h)(1). However, what I find most compelling is K.S.A. 2007 Supp. 38-2272(c), which, at the risk of being redundant, I repeat with emphasis:

"(c) Subject to subsection (d), a permanent custodian shall stand *in loco parentis* and shall exercise all of the rights and responsibilities of a parent except the permanent custodian shall not:
(1) Consent to an adoption of the child; and
(2) *be subject to court ordered child support or medical support.*"

Thus, while the new code provides for the parent's retention of the legal obligation to pay child support, it specifically exempts the caretaker from a legally enforceable duty of support. In other words, the new code clearly does not establish a concurrent or dual legal duty to support, but rather it allocates the sole legally enforceable support duty to the parent. Moreover, nothing in the old code can be construed as providing a permanent guardian with an exemption from court-ordered child support, as provided in the new code. Therefore, I am convinced that the new code was intended to change the allocation of the child support duty from the permanent guardian to the parent.

In summary, I interpret the old code as effecting a transfer of the legally enforceable child support obligation from the parent to the permanent guardian, and I interpret the new code as placing that obligation on the parent to the exclusion of the permanent custodian. Obviously, that shift affects the parent's rights and so, pursuant to K.S.A. 2007 Supp. 38-2283(a), the new code cannot be applied retroactively. I would reverse the Court of Appeals and affirm the district court.