NOT DESIGNATED FOR PUBLICATION

Nos. 117,638
117,639
117,640

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Interests of

J.D.P., J.L.T., and T.K.C.,
Minor Children.

MEMORANDUM OPINION

Appeal from Mitchell District Court; KIM W. CUDNEY, judge. Opinion filed September 14, 2018.
Affirmed in part and dismissed in part.

*Regine L. Thomson*, of Thompson & Thompson, P.A., of Scandia, for appellant.

*Jennifer R. O'Hare*, of O'Hare Law LLC, of Lincoln, guardian ad litem, *Mark J. Noah*, county
attorney, and *Kay M. Prather*, of Prather Law Office, of Beloit, for appellees.

Before STANDRIDGE, P.J., HILL and BUSER, JJ.

BUSER, J.:  This is an appeal by Mother of the district court's order terminating the parental rights over her three minor children. Mother contends she did not voluntarily relinquish her parental rights but was forced to surrender them during the termination hearing. Mother also argues the district court should have granted her unsupervised visitation during the child in need of care (CINC) proceedings. Finally, Mother asserts the district court should not have terminated her parental rights until after a psychological evaluation was completed. Upon our review of the parties' briefs and record on appeal we find no error. As discussed in this opinion, we affirm in part and dismiss in part.

1

Mother is the biological mother of J.D.P., J.L.T., and T.K.C. Each child has a different father. In this appeal we are only concerned with the issue of the termination of Mother's rights. The record is extensive but a brief overview of the proceedings is helpful to an understanding of the issues on appeal.

J.D.P., J.L.T., and T.K.C. were all adjudicated to be CINC in separate legal proceedings during 2015. The CINC determinations were largely the result of Mother's chronic use of methamphetamine, and concerns about the safety of the children when in their Mother's custody. For the next several months preceding the permanency hearing held in May 2016, various agencies were involved in an effort to reintegrate Mother with her children. Unfortunately, these efforts were unavailing primarily because Mother continued to use illegal drugs, including methamphetamine, and exhibited emotional and mental instability.

At the consolidated permanency hearing, numerous individuals testified regarding their lack of success in helping Mother reintegrate with her three children. Several therapists also testified regarding the adverse effects Mother's behavior, drug usage, and inadequate parenting skills were having on the emotional well-being of the children. A sampling of the testimony is illustrative.

Sarah McMillen, a private psychotherapist, counseled J.L.T. for over a year. McMillen testified that Mother's attendance at supervised visitations was inconsistent, and that J.L.T. did not have a bond with Mother.

Carly Bloomfield, a counselor, worked with T.K.C. for four years. She had previously recommended termination of Mother's rights. According to Bloomfield, T.K.C. will never "be healthy until she can find a consistent caregiver that's going to

provide for her emotional and physical needs, long-term." Bloomfield testified that Mother has not consistently met T.K.C.'s needs, pointing out that "[t]here's either mental health issues, hospitalizations, . . . substance abuse issues, [or] inpatient rehab." Bloomfield stated that since 2011 "there's periods of good health. Periods of unhealthy functioning. [B]ut again it always comes back to the . . . the exact same problem; not going to therapy, not complying with medication, . . . same concerns, same pattern over and over." Bloomfield recommended that, despite Mother and T.K.C.'s bond, T.K.C. should not have any contact with Mother for the rest of her childhood.

Kristal Stanton, a counselor who provided therapy to J.D.P. testified that co-parenting and family therapy sessions were not consistently successful because there were days Mother that was "very resistant" and "did not want to work the activities." Stanton believed that it would be in J.D.P.'s best interests to continue having Mother in his life only if she was consistent and controlled her mental health.

Sandra Boyles was a court appointed special advocate volunteer assigned to J.L.T.'s case. Typically, Mother would either refuse to answer her phone or decline to let Boyles enter her home. Mother told Boyles she did not keep her appointments for mental health treatment because the treatments did not help. Boyles testified that reintegration was not a viable option because:

> "if [Mother] has continued contact with [J.L.T.], he will never be free of the chaos in his life that has led up to this point in his life. There's been constant strife and situations he's—he's been exposed to. I don't believe that that will ever end if [Mother] is continuing in his life."

Rascheal Nutsch was the case manager for both J.L.T.'s and T.K.C.'s cases. Nutsch testified that Mother was difficult to work with and "often doesn't comply with the requests of the agency." Nutsch attempted to perform a drug test at Mother's home in

March 2016, but Mother did not answer the door even though she was home. Nutsch was not comfortable visiting Mother in her home because Mother had made verbal threats to her. With regard to random drug testing, Nutsch testified that "[m]ore often than not [Mother] either complies and is negative or she refuses and yells at me or just never contacts me after I make the request." Nutsch recommended termination of Mother's parental rights over T.K.C. because she had not followed the case plan and "instability is part of the reason that [T.K.C.] has a lot of the mental health issues that she has and what we've seen is while that—those contacts and inconsistencies have ceased in her life, she's starting to become a normal 12-year old for the first time really."

Christine Witt, an intensive supervision officer for Mother's boyfriend, F.J., who was on probation after being convicted of criminal threat against Mother, testified that F.J. had told her that he obtained prescription drugs from Mother. Witt testified that Mother and F.J. continued to have contact, even though F.J. was not allowed to contact Mother.

At the conclusion of the permanency hearing, the district court found the agencies involved had provided reasonable efforts to accomplish the permanency goals regarding Mother and her children. The district court found that reintegration with Mother was not a viable option for any of her children. In particular, the district court found that outside of very controlled settings, "we can't demonstrate the ability . . . to provide for the children's mental health and to provide for the children's safety or a safe environment to live in." The district court continued that Mother had multiple problems which adversely affected her children's wellbeing, including:

> "unsafe choices with relationships, noncompliance with treatment recommendations for mental health, with substance abuse, and not being able to maintain sobriety or reengage in the services to assist that.

4

"And unfortunately that chaotic lifestyle keeps spilling out into the themes and problems and the harm that it's causing the children with their anxiety levels and their worry and their stress."

The court concluded that "although there are spurts of outstanding progress, they're not maintained for any length of time that allows the Court to believe that we can get to a length of time that would make reintegration viable." A termination hearing was ordered.

On October 17, 2016, a hearing was held on the State's motion to terminate Mother's parental rights. At the outset, Mother requested a continuance because she had not yet completed her psychological evaluation, and she wanted to obtain information about her great-grandfather who she had recently learned was a Cherokee Indian. Mother also sought to discharge her court-appointed attorney and obtain another attorney.

The district court denied Mother's request for a continuance, noting that it had been four months since the petition to terminate parental rights had been filed and the hearing had previously been continued. The district court also declined to discharge her current attorney and appoint a new attorney for Mother because her current attorney was the "seventh or eighth attorney" appointed in her domestic and CINC cases and the court had to "look long and hard to find" an attorney who was willing to represent her and who did not have a conflict of interest.

Following a recess which was requested by Mother's attorney, the district court was provided with three signed relinquishment documents. Mother's attorney advised the district court that Mother wished to relinquish her parental rights over her three children.

During a lengthy colloquy with the district court, Mother said she had discussed relinquishing her parental rights with her attorney who had explained all of the

5

consequences of the relinquishment and she had no further questions. Mother informed the district court that she understood the relinquishment was permanent and, if accepted, she would have no further involvement as a parent for her three children. The following discussion occurred:

"[THE COURT]: . . . And although you are upset and this is a difficult decision, do you believe that you are making this decision voluntarily? Has any—

"[MOTHER]: No.

"[THE COURT]: —one forced you to do this?

"[MOTHER]: Yes, I am.

"[THE COURT]: You're making the decision voluntarily?

"[MOTHER]: No, I'm not.

"[THE COURT]: Is someone making you do this?

"[MOTHER]: Yes, the Mitchell County Courts.

"[THE COURT]: Do you understand, [Mother], that you have the option today of having a trial? That no one here is forcing you to do this?

"[MOTHER]: That is incorrect.

"[THE COURT]: All right, then you want to proceed with the trial? Is that correct?

"[MOTHER]: We're already doing this. Let's get it done so I can leave.

"No, I am being forced to do this. Either way it doesn't matter. I am being forced and that is my statement. And I'm leaving it at that.

"[THE COURT]: All right. Did you feel that the system is forcing you to do this?

"[MOTHER]: Yes, I know that for a fact. I've already signed. May I please be excused?

"[THE COURT]: Not yet. Do you understand that if the Court accepts these documents, that you are fully . . . relinquishing all of your rights as a parent to [J.D.P], [J.L.T.] and [T.K.C.]?

"[MOTHER]: Yes, I understand that.

"[THE COURT]: And is it your desire to proceed with the relinquishment?

"[MOTHER]: Yes, it is.

. . . .

6

"[MOTHER]:  I have no other choice. No, I have no other questions.

. . . .

"[THE COURT]:  Do you believe that you are making an informed decision today?

"[MOTHER]:  No.

"[THE COURT]:  Okay. Do you have questions?

"[MOTHER]:  No.

"[THE COURT]:  If you're not informed, why don't you have questions?

"[MOTHER]:  Because I don't. It does not matter.

"[THE COURT]:  [Mother], do you want this Court to accept the relinquishment or do you want to have a trial today?

"[MOTHER]:  I've already signed the papers so I'd like it to just move on please.

"[THE COURT]:  Do you understand that this is not something you can change your mind about later on, that it is a permanent decision?

. . . .

"[MOTHER]:  . . . I'm finished speaking. I've already signed the papers. That's all I needed to do so I need to go.

. . . .

"[MOTHER'S ATTORNEY]:  . . . When you signed those papers, did you sign them after my explaining to you all the ramifications of those papers?

"[MOTHER]:  I don't even know what you mean by that. I really don't.

"[MOTHER'S ATTORNEY]:  Okay. When you signed those papers, was it after I explained what those papers meant?

"[MOTHER]:  I signed those papers because I have no other choice. It's either me sign them over or the Courts take them away.

"That is why I signed those papers.

"[MOTHER'S ATTORNEY]:  Okay. So you signed the papers because you did not want to have a trial today; is that correct?

"[MOTHER]:  No, it's because I did not want the Mitchell County Courts to take my rights away because it's better to, uh, sign them over than to have the Courts take them away.

"[THE COURT]:  All right, then by your statements, [Mother], the Court believes that you understand the difference—

"[MOTHER]:  Yes, I do understand it.

7

"[THE COURT]: —between relinquishment and if you had a trial, the possible outcome could be termination—

"[MOTHER]: It would've been.

"[THE COURT]: —could not be term—Ms. Thompson, do you believe that the decision of your client today to sign these three relinquishments was knowingly and voluntarily made?

"[MOTHER]: No it was not.

"[MOTHER'S ATTORNEY]: I believe it was to—I believe it was. I believe that [Mother] feels she is placed in an untenable position where it is either sign, uh, uh, the relinquishment or go through trial.

"And I don't think that [Mother] wanted to go through the trial and have the outcome be termination. And I believe that she did sign those voluntarily in that, for that reason.

"[THE COURT]: [Mother], there—I have a document for each one of your children called Relinquishment of a Minor Child. Did you sign the documents?

"[MOTHER]: Yes, I did."

The termination documents were patterned after a form created by the Kansas Judicial Counsel. Each of the three relinquishment documents provided in relevant part:

**"NOTICE TO PARENT: This is an important legal document and by signing it you are permanently giving up all custody and other parental rights to the child named herein. . . .**

. . . .

"5.    I do hereby relinquish the child to the Secretary of DCF, which I understand the Secretary will have full power and all the rights of a birth parent or legal guardian over the child, including the power to place the child for adoption and give consent thereto.

"6.    I wish to, and I understand that by signing this relinquishment I do, permanently give up all custody and other parental rights I have to such child, including the right to receive notice of any subsequent adoption proceedings involving the child."

8

Immediately after this language the document provided: "I have read and understand the above and I am signing it as my free and voluntary act." Mother's signature was affixed after this statement on all three relinquishment documents.

Mother's attorney also signed a declaration which was titled, "Certificate of Attorney" This declaration stated: "I am a licensed attorney representing the parent named above and have explained to that parent that by signing this consent the agency will exercise all parental rights to the child and that parent confirmed that intention and desire." The signature of Mother's attorney was affixed below this declaration on all three relinquishment documents.

The district court concluded that Mother had made a knowing and voluntary relinquishment of her parental rights and accepted the relinquishment of J.D.P, J.L.T., and T.K.C., and terminated Mother's parental rights. Mother appeals.

VOLUNTARY RELINQUISHMENT OF MOTHER'S PARENTAL RIGHTS

On appeal, Mother contends the district court erred by finding that she voluntarily relinquished her parental rights. In a brief argument she states:

> "Mother believed that she was being forced to accept a relinquishment. It was evident
> from the record that Mother was desperate to not lose her children and felt forced into
> signing a relinquishment by not just her word, but also her behavior; i.e., requesting a
> continuance, trying to claim Native American heritage at the last minute, and attempting
> to fire her attorney."

The guardian ad litem (GAL) responds: "There is nothing in the record to support [Mother's] argument that she was forced or compelled to relinquish her parental rights. . . . Moreover, there is nothing in the record to indicate that she was under duress at the time of the relinquishment."

9

A relinquishment of parental rights is "'a complete and final divestment of all legal rights, privileges, duties, and obligations of the parent and child with respect to each other.'" *State ex rel. Secretary of SRS v. Bohrer*, 286 Kan. 898, 914, 189 P.3d 1157 (2008) (quoting *State ex rel. Secretary of SRS v. Clear*, 248 Kan. 109, 115, 804 P.2d 961 [1991].) A relinquishment of parental rights must be knowing, free, and voluntary. *In re C.D.A.*, No. 111,674, 2014 WL 5801348, at *3 (Kan. App. 2014) (unpublished opinion). When the district court determines the proposed relinquishment is voluntary and the parent has been fully advised of all rights and consequences, the court has the power to approve the relinquishment. *In re A.W.*, 241 Kan. 810, 816, 740 P.2d 82 (1987).

The voluntariness of an individual's relinquishment of parental rights is a mixed question of fact and law. *In re C.D.A.*, 2014 WL 5801348, at *3. When reviewing whether a parent voluntarily relinquished his or her rights, an appellate court applies a two-step standard of review. *In re D.R.W.*, No. 113,629, 2015 WL 8591600, at *5 (Kan. App. 2015) (unpublished opinion). First, we review the district court's factual findings to determine whether they were supported by substantial competent evidence. Next, we exercise unlimited review over the district court's conclusions of law. 2015 WL 8591600, at *5.

The provisions of K.S.A. 2017 Supp. 38-2268(a)-(b) govern the voluntary relinquishment of parental rights. K.S.A. 2017 Supp. 38-2268 provides several procedural safeguards to insure an individual's relinquishment of parental rights is voluntary. For example, the relinquishment must be in writing, it must substantially conform to the form provided by the Judicial Council, it must be acknowledged before a judge or notary, and if acknowledged before a judge, the judge must advise the parent of the consequences of relinquishing parental rights. K.S.A. 2017 Supp. 38-2268(b)(2),(3).

"A voluntary act is one 'done by design or intention.'" *In re C.D.A.*, 2014 WL 5801348, at *4 (quoting *In re C.P.*, No. 109,359, 2014 WL 349616, at *5 (Kan. App.

10

2014) [unpublished decision]). The determination of whether consent to relinquish parental rights was freely and voluntarily given depends on the facts and the circumstances of each case. *In re D.R.W.*, 2015 WL 8591600, at *7.

Upon our independent review of the facts of this case, we are convinced the district court's factual findings were supported by substantial competent evidence and the court's legal conclusion that Mother had knowingly and voluntarily relinquished her parental rights was not error. Several factors compel our conclusion given the totality of circumstances in this case.

First, Mother and her attorney signed three relinquishment of rights forms relating to her children. These documents were in substantial compliance with the form provided by the Kansas Judicial Council. Kansas law provides that a properly signed relinquishment "serves as prima facie proof that the written consent was freely and voluntarily given, and the consenting parent must show fraud, duress, undue influence, mistake, or lack of understanding to rebut the presumption." 2015 WL 8591600, at *7. Mother's counsel also certified that Mother's relinquishment was knowing, and that Mother desired to voluntarily relinquish her rights.

Second, while Mother's argument is best understood as claiming to have been under duress, she does not identify any threat, pressure, or coercion that was exerted upon her in this case. Perhaps the GAL states it best:

> "[Mother] alleges that she was forced into signing the relinquishment by the system. Although this statement does not clearly indicate her state of mind, it appears to reflect Mother's struggle to make such a difficult decision. In particular, her struggle to reconcile her desire to keep her children with her inability to care for them."

11

Our independent review of the record convinces us that Mother's statements made at the hearing indicating dissatisfaction with voluntarily terminating her parental rights reflected her discontent with the difficult options before her. As briefly summarized in the Factual and Procedural Background, there was substantial if not overwhelming evidence that Mother, for a lengthy period of time and despite the best efforts of agencies committed to reuniting Mother with her children, had shown an inability to parent her children. Given this evidence, it is apparent that Mother believed the trial would result in the district court ordering termination. At the hearing, Mother explained that she decided to relinquish her rights, because she felt it was a better result than if she went to trial and the district court took those parental rights away. As Mother's attorney explained, Mother was in an untenable position:  She was facing a trial wherein the district court would surely terminate her parental rights or she could sign voluntary relinquishments. Because Mother concluded that under either scenario she would lose the right to parent her children, she decided to forego the trial and opted to voluntarily sign the relinquishments.

While we acknowledge Mother's distress at the prospect of legal action to have her parental rights terminated, our review of the circumstances convinces us that her difficult decision was a knowing and voluntary act. As our Supreme Court held in *In re A.W.*, the mere pendency of a termination of parental rights proceeding does not preclude a voluntary relinquishment. 241 Kan. at 816. Moreover, there is "no merit in the contention that judicial proceedings, per se, subject a parent to duress which might invalidate a voluntary relinquishment." 241 Kan. at 816.

Additionally, as our court has previously observed,

"the emotions, tensions, and pressures of a termination-of-parental-rights proceeding are insufficient to void the relinquishment of a parent's rights—even when the appealing parties argued that they had been pressured to relinquish their rights or when they had

12

been advised that they were unlikely to succeed at trial." *In re C.D.A.*, 2014 WL
5801348, at *8.

Third, we are impressed with the district court's lengthy and thorough questioning of Mother in an effort to ascertain whether her relinquishments were knowingly and voluntarily made. In this way, the district court made sure that Mother understood the gravity of her decision. Mother stated that she understood she was relinquishing her children to the secretary of the Kansas Department for Children and Families, she would have "no further say or involvement as a parent," and her decision was permanent. The district court also made certain that Mother understood she had the option to proceed with a trial instead of relinquishing her parental rights. The district court repeatedly asked Mother if she would prefer a trial rather than a relinquishment, and each time Mother responded that she wanted to proceed with the relinquishment.

For all of these reasons, we hold the district court did not err in its legal conclusion that Mother knowingly and voluntarily relinquished her parental rights.

DENIAL OF UNSUPERVISED VISITATION

Mother next contends the district court erred by not allowing her to have unsupervised visitation with her children during the CINC proceedings.

While not addressed by the parties, Mother's argument raises two jurisdictional questions. As a result, we must consider if our court has jurisdiction to resolve whether the district court should have granted Mother unsupervised visitation during the CINC proceedings. Although no challenge to this court's jurisdiction has been made by the State or the GAL, our court has a duty to question jurisdiction on its own initiative. *Northern Natural Gas Co. v. ONEOK Field Services Co.*, 296 Kan. 906, 916, 296 P.3d 1106

13

(2013). Whether jurisdiction exists is a question of law over which our court's scope of review is unlimited. *Fuller v. State*, 303 Kan. 478, 492, 363 P.3d 373 (2015).

In *In re N.A.C.*, 299 Kan. 1100, Syl. ¶ 3, 329 P.3d 458 (2014), our Supreme Court held that K.S.A. 2017 Supp. 38-2273(a) specifically limits the appealable orders in a CINC case to those determining temporary custody, adjudication, disposition, and a finding of unfitness or the termination of parental rights. Accordingly, "[i]f an order in a CINC case does not fit within these five categories, it is not appealable." 299 Kan. 1100, Syl. ¶ 3. A disposition order under K.S.A. 2017 Supp. 38-2255 and K.S.A. 2017 Supp. 38-2256 is an "order made within 30 days of adjudication that determines placement of the child or any other order entered during the process of managing the child's placement until the order terminating parental rights is entered." *In re A.S.*, 52 Kan. App. 2d 173, 176, 364 P.3d 1203 (2015).

The procedure for an appeal in CINC cases is "governed by article 21 of chapter 60 of the Kansas Statutes Annotated." K.S.A. 2017 Supp. 38-2273(c). Under K.S.A. 2017 Supp. 60-2103(a), an appeal must be taken within "30 days from the entry of the judgment." The notice of appeal "shall designate the judgment or part thereof appealed from." K.S.A. 2017 Supp. 60-2103(b).

Mother's argument that the district court erred by failing to order unsupervised visitation has two jurisdictional problems. First, an order of visitation is not itself an order addressing the children's physical placement. In *In re M.H.D.*, No. 116,821, 2017 WL 3001036, at *1 (Kan. App. 2017) (unpublished opinion) the district court entered an order of disposition that included an order for the children to be immunized. This court found it lacked jurisdiction over Mother's appeal of the immunization order because, although the directive was included in an order of disposition, the order Mother complained of was not itself an order addressing the children's placement. 2017 WL 3001036, at *2.

14

Like the immunization order in *In re M.H.D.*, in this case, the specific orders limiting Mother to supervised visitation do not address the childrens' placement. While the orders Mother complains of were included within orders of disposition, they do not fit within the five appealable categories in a CINC case.

The second apparent jurisdictional problem is that Mother failed to timely appeal from any dispositional order which denied her unsupervised visitation. In *In re M.E.*, No. 113,482, 2015 WL 7693669, at *4 (Kan. App. 2015) (unpublished opinion) the district court terminated a father's parental rights in November 2014. On appeal, the father argued the district court should have reintegrated him with his children in June or July 2013. Our court held that it did not have jurisdiction to review the issue because: (1) The father did not file a timely notice of appeal regarding the dispositional order determining the children should not be reintegrated with him; and (2) the father's notice of appeal only specified his desire to appeal the termination of his parental rights. 2015 WL 7693669, at *5.

In the present case, Mother does not challenge a specific order which denied her unsupervised visitation. It appears, however, the last order regarding visitation that occurred prior to Mother's relinquishment was an agreed order involving J.D.P.'s case which was filed on September 16, 2016. Mother filed her notice of appeal on November 7, 2016—more than 30 days after this order. Moreover, in her notice of appeal, Mother stated "she appeals from the decision of the Court to accept her relinquishment and terminate her parental rights on October 17, 2016."

Even assuming that the district court orders regarding Mother's visitation fell within the five categories of appealable orders in CINC cases, our court lacks jurisdiction to review Mother's issue because she failed to file a notice of appeal regarding any of those orders within 30 days. Additionally, Mother's notice of appeal only specified her desire to appeal the order terminating her parental rights without mentioning any order

15

limiting Mother to supervised visitation. It is a fundamental proposition of Kansas appellate procedure that "'an appellate court only obtains jurisdiction over the rulings identified in the notice of appeal.' [Citation omitted.]" *Associated Wholesale Grocers, Inc. v. Americold Corporation*, 293 Kan. 633, 637, 270 P.3d 1074 (2011). For all these reasons, we hold that our court is without jurisdiction to address Mother's argument. This issue is dismissed.

FAILURE TO OBTAIN PSYCHOLOGICAL EVALUATION

For her final issue, Mother contends that Saint Francis Community Services (SFCS) failed to make reasonable efforts to rehabilitate the family because prior to the termination hearing the psychological evaluation with a parental component was never completed. As a result, Mother argues the district court should not have terminated her parental rights until that evaluation was finished.

In a CINC proceeding, there is an obligation on the relevant agencies to expend reasonable efforts towards reintegrating the child with his or her parents by correcting the conduct and condition that results in the removal of the child. See *In re B.T.*, No. 112,137, 2015 WL 1125289, at *8 (Kan. App. 2015) (unpublished opinion); K.S.A. 2017 Supp. 38-2201(b)(8). These agencies are not required, however, to make "a herculean effort to lead the parent through the responsibilities of the reintegration plan." 2015 WL 1125289, at *8. In short, an agency is required to make reasonable efforts but the agency does not need to exhaust any and all resources to rehabilitate a parent.

In this case, the permanency plans required that Mother continue to receive mental health services, follow any recommendations, and gain skills to make healthier choices in her life for herself and her children. In order to help Mother achieve this goal, SFCS determined that Mother would benefit from a full psychological evaluation with a parental component. SFCS asked that Mother complete the evaluation at Veridian and

16

stated that SFCS would pay the costs and make arrangements for the evaluation. Mother's attorney reported that Mother advised she would be "happy to do that." On January 27, 2016, the district court ordered that Mother submit to this evaluation.

On March 1, 2016, SFCS scheduled an appointment at Veridian for Mother's psychological evaluation to occur on April 4, 2016. On that date, Mother failed to attend the appointment because she had "other things to do." Although Mother wanted to use High Plains to conduct the testing, that facility did not offer a parenting component to the evaluation. Mother was encouraged to arrange a new appointment at Veridian but more than six months later, the termination hearing occurred, and Mother had yet to schedule or attend an evaluation.

Mother argues that SFCS did not make reasonable efforts to rehabilitate her family because "SFCS scheduled the psychological/parenting evaluation; let Mother know about it; but did not otherwise help Mother attend the same."

At the outset, Mother's argument overlooks the numerous reasonable efforts expended by SFCS to rehabilitate Mother other than those focused on the psychological evaluation. Regardless, Mother's argument has no merit. SFCS recognized that Mother may have mental health issues not previously identified. The agency recommended that Mother submit to an evaluation to help her address her mental health issues, scheduled an appointment for the evaluation, and paid for it. Moreover, after Mother failed to attend the evaluation, SFCS attempted to arrange the evaluation at Mother's preferred mental health provider but upon learning that the agency was not able to comply with the district court's order, SFCS encouraged Mother to schedule another appointment with Veridian. These efforts were reasonable.

Finally, in the last paragraph of her brief, Mother states that SFCS failed to accommodate her mental illness. The Revised Kansas Code for Care of Children addresses a parent's disability in K.S.A. 2017 Supp. 38-2201(c), which provides:

"(c) Nothing in this code shall be construed to permit discrimination on the basis of disability.

(1) The disability of a parent shall not constitute a basis for a determination that a child is a child in need of care, for the removal of custody of a child from the parent, or for the termination of parental rights without a specific showing that there is a causal relation between the disability and harm to the child.

(2) In cases involving a parent with a disability, determinations made under this code shall consider the availability and use of accommodations for the disability, including adaptive equipment and support services."

Preliminarily, Mother does not identify a particular disability apart from making a conclusory claim of mental illness. Contrary to Mother's assertions, her case plan included support services and tasks to address her emotional and mental health issues. As part of this effort, SFCS recognized that a psychological evaluation was appropriate to further address Mother's needs. However, over several months Mother failed to consistently attend mental health sessions and, as just discussed, did not attend the scheduled evaluation. While Mother complains of a lack of accommodation, the record is clear that the district court worked with various agencies throughout this litigation to address Mother's emotional and mental health issues. Moreover, Mother does not indicate what additional reasonable efforts should have been made in order to facilitate Mother's compliance with the case plan. Mother has failed to show that SFCS did not exert reasonable efforts to work with her in addressing her mental health issues. We find no error.

Affirmed in part and dismissed in part.

18